**Kenneth D. SHERMAN, Donald McNeal, Armondo Barker, and Tonyell McNeal, Plaintiffs,**

v.

**Nick KASOTAKIS, Individually and d/b/a the Horizons Family Restaurant, Defendant.**

No. C02–4047–MWB.

United States District Court,
N.D. Iowa,
Western Division.

April 19, 2004.

Shelley A. Horak, Horak & Associates, Sioux City, IA, for Plaintiffs.

Robert Tiefenthaler, Brian Blane Vakulskas, Vakulskas & Hoffmeyer, Jay Elliott Denne, Munger, Reinschmidt & Denne, Sioux City, IA, for Defendant.

**MEMORANDUM OPINION AND ORDER ON DEFENDANT'S PARTIAL MOTION FOR JUDGMENT AS A MATTER OF LAW OR IN THE ALTERNATIVE, MOTION FOR PARTIAL NEW TRIAL OR REMITTITUR OF PUNITIVE DAMAGES VERDICT AND JUDGMENT; PLAINTIFFS' MOTION TO MAKE ADDITIONAL FINDINGS; AND PLAINTIFFS' APPLICATION FOR ATTORNEY'S FEES**

BENNETT, Chief Judge.

## TABLE OF CONTENTS

I.    *FACTUAL AND PROCEDURAL BACKGROUND* ...........................848

II.   *LEGAL ANALYSIS* ....................................................852
    A.   *Motion For Partial Judgment As A Matter of Law* .......................852
        1.  *Arguments of the Parties* .........................................852
        2.  *Standards* ......................................................853
            *a.*   *Rule 50* ...................................................853
            *b.*   *Rule 51* ...................................................858
        3.  *Plain Error Review* ..............................................859
            *a.*   *Employer liability* .........................................860
            *b.*   *Jury instructions* ..........................................863
    B.   *Motion For Partial New Trial or Remittitur* ...........................866
        1.  *Standards* ......................................................866
            *a.*   *Rule 59* ...................................................866
            *b.*   *Constitutionally excessive verdict v. remittitur* .................867
        2.  *New trial* ......................................................868
        3.  *Remittitur* .....................................................870
        4.  *Constitutionality* ...............................................870
            *a.*   *Standard* ..................................................870
            *b.*   *Analysis under the Gore guideposts* ...........................871
                *i.*   *Reprehensibility* .........................................872
                *ii.*   *Proportionality* .........................................873
                *iii.*   *Comparable civil or criminal penalties* .....................875
                *iv.*   *Resolution* ..............................................876
    C.   *Plaintiffs' Motion to Make Additional Findings* .........................876
    D.   *Plaintiffs' Application For Attorney's Fees* ............................880
        1.  *Applicable Standards* ............................................881
        2.  *Reasonable hourly rate* ..........................................881
        3.  *Hours reasonably expended* .......................................883
        4.  *Recoverable costs and expenses* ..................................885

III.  *CONCLUSION* ....................................................885

After a two-day jury trial in this racial discrimination in a public accommodation case at a local Sioux City restaurant, the jury returned a verdict in favor of the four individual plaintiffs. The jury awarded each plaintiff $1.00 in nominal damages and $12,500.00 in punitive damages. The jury apparently determined that the plaintiffs did not suffer any emotional distress damages resulting from the defendant's unlawful conduct. A number of post-trial motions followed the jury's disposition of this case. The defendant takes issue with the amount of punitive damages awarded, in relationship to the amount of compensatory damages awarded, and seeks judgment as a matter of law and/or a new trial on the issue of punitive damages, or alternatively that the court order a remittitur of the punitive damages. Predictably, the plaintiffs resist the defendant's motion on all grounds. Also at issue are the plaintiffs' application for attorney's fees and costs and the plaintiffs' motion requesting the court amend the judgment and order injunctive relief. Both of plaintiffs' motions are resisted by the defendant.

## I. FACTUAL AND PROCEDURAL BACKGROUND [1]

This case stems from a single incident occurring at The Horizons Family Restau-

---

1. As will be discussed more fully below, the court recites these facts in the light most favorable to the plaintiffs, according them the benefit of all reasonable inferences drawn from the evidence presented at trial. *See Minneapolis Cmty. Dev. Agency v. Lake Cal-*

rant on June 23, 2001. In the early morning of June 23, 2001, Kenneth Sherman, Donald McNeal, Armondo Barker and Tonyell McNeal[2] ("plaintiffs"), planned to leave from the Club 712[3] for The Horizons Family Restaurant. The outing was spurred by the impending wedding of plaintiff Kenneth Sherman later that afternoon—the four intended the outing to The Horizons Family Restaurant to eat a meal to constitute Sherman's bachelor party. The bachelor party outing to The Horizons Family Restaurant did not commence until the wee morning hours of June 23, 2001, for the reason that three of the plaintiffs— Donald McNeal, Armondo Barker and Tonyell McNeal—were working at Club 712 that night[4] and had to close the club down before they could leave. Kenneth Sherman arrived at the club around 10:00 p.m. on the evening of June 22, 2001, and hung out there until the other three plaintiffs were done with their work duties. At approximately 3:30 a.m. the plaintiffs[5] left the 712 Club and went to The Horizons Family Restaurant for a meal.

Upon entering The Horizons Family Restaurant the plaintiffs were greeted by a host. The plaintiffs formed a single file line behind the host, and the host began to lead the plaintiffs over to a particular section of the restaurant to be seated. As the group, following the hostess, approached the section the waiter for that section stood up in front of the hostess, spread his arms out so as to block passage into the section, and told the hostess: "I told you about bringing all these niggers over here." The host stepped back and asked the waiter to repeat himself, to which the waiter repeated what he had just said. The plaintiffs' immediate responses to these comments were varied; Donald McNeal and Tonyell McNeal turned away and stood off to the side, while Kenneth Sherman and Ricky Warren held Armondo Barker back from attempting to physically harm the waiter. The waiter then made a comment to the effect of "that is what's wrong with you people." Those present to witness the incident included the host, the waiter, the shift supervisor and an off-duty police officer. Sioux City Police Officer David Mentzer, who was off-duty at the time but was contracted by The Horizons Family Restaurant to provide private security at the restaurant on the overnight shift on that night, testified that he overheard the waiter say the following to the plaintiffs: "we don't serve your kind here." The host proceeded to seat the plaintiffs in another section of the restaurant. Tonyell McNeal, visibly upset by what had transpired, left almost immediately after the group was seated. The plaintiffs then witnessed the host go back over and approach the waiter about his actions—the two apparently got in a mild shoving match over the issue. The plaintiffs testified that the host was upset, and questioned why the waiter called the plaintiffs 'niggers.' Officer Mentzer broke up the scuffle.[6] Officer

*houn Assocs.*, 928 F.2d 299, 301 (8th Cir. 1991).

2. Tonyell McNeal is Donald McNeal's younger brother.

3. The former Club 712 was located at 414 West Seventh Street in Sioux City, Iowa. The establishment is now known as Shakers Restaurant.

4. Donald McNeal worked as a bartender and assistant manager, Tonyell McNeal as a bouncer, and Armondo Barker as a deejay.

5. The four named plaintiffs were accompanied by a fifth individual, Ricky Warren, who chose not to participate in this litigation. Ricky Warren is also an African American male.

6. Officer Mentzer testified that there were words exchanged, but that there was not a physical scuffle between the host and the offending waiter.

Mentzer then approached the plaintiffs at where they were seated and asked if they wanted to make a statement—all of the plaintiffs declined at the time.

Apparently, after the plaintiffs were seated and approached by Officer Mentzer, word of the incident had spread to other restaurant employees working that night. The plaintiff Donald McNeal testified that the host's wife, who was working in the kitchen, came out from the kitchen and started yelling and screaming at the supervisor—she was apparently upset because this particular waiter had previously made racially derogatory comments to her, her husband, and others working in the kitchen and she was wondering how long the supervisor would just sit by and let it continue to happen. Donald McNeal also testified that a cook, who was also African American, came out of the kitchen and started speaking to the supervisor about how everyone in the restaurant knew that the waiter was inclined to make racially derogatory remarks, and wondered if the fact that the waiter had now used them towards customers would spur some response on the part of management. The supervisor told both the cook and the host's wife to go back to what they were doing.

The supervisor then approached the plaintiffs' table and explained that the waiter's conduct was unacceptable, that the waiter would be fired and that he would take care of it that instant. The supervisor then gave the plaintiffs each a menu and informed them that their meals would be free. However, despite the promises of the supervisor, the plaintiffs never saw the supervisor approach the offending waiter—in fact, the offending waiter continued to work in his section for the duration of the time that the plaintiffs remained at The Horizons Family Restaurant that morning.

Each of the plaintiffs testified that at the time they arrived at the restaurant both sections of the restaurant, the section manned by the offending waiter and the section they were actually seated in, had seating available to accommodate their party of five. After the plaintiffs were seated they noticed a segregated seating arrangement being implemented. Specifically, the plaintiffs noted that Mexican customers and an interracial couple were all seated in the same area as the plaintiffs, while four Caucasian patrons were seated in the section worked by the offending waiter. When these other patrons were seated there, again, was ample room in either section to seat them.

Each of the plaintiffs ordered something, though not many of them ate any substantial amount. The remaining group—Donald McNeal, Armondo Barker and Kenneth Sherman—stayed at the restaurant for approximately 30–45 minutes before leaving. After leaving the restaurant, Donald McNeal, Armondo Barker and Kenneth Sherman went over to Donald McNeal's home to discuss what had just taken place. Tonyell McNeal joined the other three plaintiffs at Donald McNeal's house at a later time. None of the plaintiffs ever filed an official complaint with the police department.

Nick Kasotakis, the owner of The Horizons Family Restaurant, was not present at the time of this incident on the morning of June 23, 2001.

Five or six months after the incident occurred, Donald McNeal returned to The Horizons Family Restaurant to see if the offending waiter was still working there— to see if the supervisor had fired him like he claimed he would. Donald McNeal entered the restaurant, observed the offending waiter working, and left.

In June 2002, after obtaining a right to sue letter from the Iowa Civil Rights

Commission, the plaintiffs filed suit against Mr. Kasotakis, individually and doing business as The Horizons Family Restaurant ("defendant"). In their complaint the plaintiffs asserted racial discrimination in a public accommodation in violation of the Civil Rights Act of 1964 under 42 U.S.C. § 2000a[7] and 42 U.S.C. § 1981,[8] as well as the Iowa Civil Rights Act under Iowa Code § 216.7 (2003).[9] The case was tried to a jury for two days, beginning on February 18, 2004. Each of the four plaintiffs testified at trial as to the facts surrounding the offending incident. The plaintiffs also testified as to what ramifications the incident purportedly had upon their lives.[10] In addition to their own testimony, the plaintiffs also called Officer Mentzer as a witness. The defense consisted of the testimony of two witnesses: Mr. Kasotakis, the owner of The Horizons Family Restaurant, and Melvin Bear, who claimed to be the host present at the time of the incident. The plaintiffs then offered, in rebuttal, the testimony of Kenneth Sherman and Donald McNeal, both of whom testified that Melvin Bear was not the host that attempted to seat them on the morning of June 23, 2001. The case was submitted to the jury on the morning of February 19, 2004. On the afternoon of February 19, 2004, the jury returned its verdict. It found in favor of each of the four plaintiffs on all of their claims, and further awarded each of the four plaintiffs $1.00 in nominal damages and $12,500.00 in punitive damages for the defendant's wrongful conduct. The jury did not award emotional distress damages to any of the plaintiffs—apparently having determined that the plaintiffs did not suffer any emotional distress damages resulting from the defendant's unlawful conduct. The Clerk of Court entered judgement in the amount of $1.00 nominal damages and $12,500.00 punitive damages, with interest and costs as provided for by law, for each

7. 42 U.S.C. § 2000a, also known as "Title II," states that "[a]ll persons shall be entitled to full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation ... without discrimination or segregation on the grounds of race, color, religion, or national origin."

8. 42 U.S.C. § 1981 provides, in pertinent part, that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, ... and to full and equal benefit of all laws ... as is enjoyed by white citizens."

9. Iowa Code § 216.7 provides in pertinent part:
  1. It shall be an unfair or discriminatory practice for any owner, lessee, sublessee, proprietor, manager, or superintendent of any public accommodation or any agent or employee thereof:
  a. To refuse or deny to any person because of race, creed, color, sex, national origin, religion or disability the accommodations, advantages, facilities, services, or privileges thereof, or otherwise to discriminate against any person because of race, creed, color, sex, national origin, religion or disability in the furnishing of such accommodations, advantages, facilities, services, or privileges.
Iowa Code § 216.7(1)(a).

10. Donald McNeal testified that he was still affected by the incident in that he worried about this type of discrimination happening to his young children and that he gets worried whenever he goes to restaurants with his family. Tonyell McNeal testified that he was still affected by the incident, that he had mental counseling to deal with the incident, that he left his employment shortly after the incident because his coworkers made light of the situation, and that he now has trust issues and avoids talking to strangers. Armondo Barker testified that he was still upset about the incident and that ever since the incident he has not gone out to eat at a public restaurant out of fear of being treated badly. Kenneth Sherman testified that the incident still angered and upset him and, further, that it caused the temporary break-up of his marriage.

plaintiff on February 20, 2004. (Doc. No. 25).

On March 1, 2004, the defendant filed its Partial Motion for Judgment as a Matter of Law or in the Alternative, Motion for Partial New Trial or Remittitur or Punitive Damages Verdict and Judgment (Doc. No. 26)—in which the defendant takes issue with the punitive damages award asserting that it was not supported by substantial evidence, and that it is grossly excessive and a constitutional violation of the Fourteenth Amendment.[11] To remedy these alleged maladies the defendant requests either judgment as a matter of law, a partial new trial on the issue of punitive damages, or a remittitur. The plaintiffs filed a resistance wholly resisting the defendant's motion on March 11, 2004. (Doc. No. 31). Additionally, the plaintiffs filed a Motion to Make Additiional[12] Findings, which requests the court, in light of the jury verdict in the plaintiffs' favor, to order injunctive relief and require the defendant to provide proof that it trains all of its employees not to provide substandard service to patrons of minority races, or subject patrons of minority races to derogatory remarks. (Doc. No. 27). The defendant filed a resistance to the plaintiff's motion on March 17, 2004. (Doc. No. 33). Finally, the plaintiffs filed a Motion for Attorneys Fees on March 12, 2004, which requests the court order the defendant pay the plaintiffs' attorney's fees and costs pursuant to 42 U.S.C. § 1988. (Doc. No. 32). On March 29, 2004, Mr. Jay Denne of Munger, Reinschmidt & Denne, L.L.P., in Sioux City, Iowa, entered an appearance as co-counsel on behalf of the defendant. (Doc. No. 35). Also on March 29, 2004,

the defendant filed a resistance to the plaintiffs' application for attorney's fees. (Doc. No. 36).

Oral argument on these matters was held on April 8, 2004. At oral argument, plaintiffs Kenneth Sherman, Donald McNeal and Armondo Barker were represented by Shelley A. Horak, of Horak and Associates in Sioux City, Iowa. Plaintiff Tonyell McNeal was represented by Robert Tiefenthaler, of Tiefenthaler Law Office, P.C., in Sioux City, Iowa. The defendant was represented by Brian Vakulskas, of Vakulskas & Hoffmeyer, in Sioux City, Iowa, and Jay Denne of Munger, Reinschmidt & Denne in Sioux City, Iowa. The matter is now fully submitted and ready for determination by this court.

## II. LEGAL ANALYSIS

### A. Motion For Partial Judgment As A Matter of Law

#### 1. Arguments of the Parties

The defendant contends that there was insufficient evidence presented at trial to support the award of punitive damages in the amount of $12,500.00 for each plaintiff, and therefore it is entitled to judgment as a matter of law with regard to the issue of punitive damages. Specifically, the defendant asserts that the law imposes more stringent requirements for assessing punitive damages against a principal for the acts of its agent than the general law imposing liability upon an employer or principal. Defendant cites the United States Supreme Court case of *Kolstad v. ADA*, 527 U.S. 526, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999)—which dealt with the

---

11. Though the defendant argues that the punitive damages award is excessive in violation of the Due Process Clause of the *Fourteenth* Amendment, the argument is actually under the Due Process Clause of the Fifth Amendment. This is further discussed *infra* at footnote 18.

12. This typographical error was contained in caption of the plaintiffs' motion. Henceforth, when the court refers to this motion by name it will correct plaintiffs' typographical error and use 'additional' rather than 'additiional.'

award of punitive damages in a Title VII employment discrimination case—as support for this argument. Defendant notes the four exceptions recited in *Kolstad* for when punitive damages can be awarded against the principal for acts of the agent [13] and surmises that there was no evidence presented at trial which would place this case within any of the exceptions. Specifically, the defendant contends that there was no evidence that: (1) Mr. Kasotakis authorized the actions of the employee; (2) Mr. Kasotakis, prior to the incident, knew the employee had discriminated against customers; (3) the discriminatory acts were performed by a person with managerial capacity; or (4) Mr. Kasotakis ratified the actions of the employee. Defendant concludes by stating that no evidence was presented that showed that the defendant, individually or as The Horizons Family Restaurant, acted maliciously or with reckless indifference to the plaintiffs' civil rights—therefore, the award of punitive damages should be stricken.

The plaintiffs counter the defendant's position by stating that agency principles do not restrict the punitive damages awarded in this case. Specifically, the plaintiffs point out that there is no authority for the defendant's position that *Kolstad*, a Title VII employment discrimination case, should be applied with equal force to a public accommodations case under 42 U.S.C. § 1981. To the contrary, the plaintiffs assert that the courts have applied a different standard to consumer cases—and that the final jury instruction on punitive damages, to which the defendant *did not object*, is a correct statement of the law. The plaintiff points to the case of *Arguello v.Conoco, Inc.*, 207 F.3d 803 (5th Cir.), *cert. denied*, 531 U.S. 874, 121 S.Ct. 177, 148 L.Ed.2d 121 (2000). as addressing employer liability for consumer encounters with non-supervisory employees. In *Arguello* the Fifth Circuit Court of Appeals applied the general agency principles as stated in the RESTATEMENT (SECOND) OF AGENCY § 219 (1958) to determine whether an employer is subject to liability for the torts committed by his employee acting in the scope of his employment in the context of a public accommodations discrimination suit under 42 U.S.C. § 2000a and 42 U.S.C. § 1981. The plaintiffs assert that there was sufficient evidence presented for the jury to find the defendant liable for the acts of its employee under the analysis used in *Arguello*.[14] Additionally, the plaintiffs contend that evidence at trial supports an inference by the jury that the actions of the employee were either normal business practice or that the business ratified the employee's actions.

### 2. Standards

#### a. Rule 50

Rule 50 of the Federal Rules of Civil Procedure outlines the standards for a mo-

---

13. The four exceptions cited in *Kolstad* are where: "(a) the principal authorized the doing and the manner of the act, or (b) the agent was unfit and the principal was reckless in employing him, or (c) the agent was employed in a managerial capacity and was acting in the scope of employment, or (d) the principal or a managerial agent of the principal ratified or approved the act." *Kolstad*, 527 U.S. at 542–43, 119 S.Ct. 2118 (citing RESTATEMENT (SECOND) OF AGENCY § 217(c) (1957)) (internal citations omitted).

14. The *Arguello* court looked to the following factors to determine employer liability for the torts of a servant acting within the scope of their employment: "1) the time, place and purpose of the act; 2) its similarity to acts which the servant is authorized to perform; 3) whether the act is commonly performed by servants; 4) the extent of departure from normal methods; and 5) whether the master would reasonably expect such act would be performed." *Arguello*, 207 F.3d at 810 (citing *Domar Ocean Transp. Ltd. v. Indep. Refining Co.*, 783 F.2d 1185, 1190 (5th Cir.1986)).

tion for judgment as a matter of law. In pertinent part, Rule 50 provides:

**(a) Judgment as a Matter of Law.**

(1) If during the trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue.

(2) Motions for judgment as a matter of law may be made at any time before the submission of the case to the jury. Such a motion shall specify the judgment sought and the law and the facts on which the moving party is entitled to the judgment.

**(b) Renewing Motion for Judgment After Trial; Alternative Motion for New Trial.** If, for any reason, the court does not grant a motion for judgment as a matter of law made at the close of all the evidence, the court is considered to have submitted the action to jury subject to the court's later deciding the legal questions raised by the motion. The movant may renew its request for judgment as a matter of law by filing a motion no later than 10 days after entry of judgment—and may alternatively request a new trial or join a motion for a new trial under Rule 59. In ruling on a renewed motion, the court may:

(1) if a verdict was returned:

(A) allow the judgment to stand,

(B) order a new trial, or

(C) direct entry of judgment as a matter of law; or

(2) if no verdict was returned;

(A) order a new trial, or

(B) direct entry of judgment as a matter of law.

FED. R. CIV. P. 50(a)-(b) (2004).

In reviewing a motion for judgment as a matter of law the court is required to: consider the evidence in the light most favorable to the prevailing party, assume that the jury resolved all conflicts of evidence in favor of that party, assume as true all facts which the prevailing party's evidence tended to prove, give the prevailing party the benefit of all favorable inferences which may reasonably be drawn from the facts, and deny the motion, if in light of the foregoing, reasonable jurors could differ as to the conclusion that could be drawn from the evidence.

*Minneapolis Community Development Agency v. Lake Calhoun Associates,* 928 F.2d 299, 300 (8th Cir.1991) (quoting *Atlas Pile Driving Co. v. DiCon Fin. Co.,* 886 F.2d 986, 989 (8th Cir.1989)); *see also Ryther v. KARE 11,* 108 F.3d 832, 836 (8th Cir.), *cert. denied,* 521 U.S. 1119, 117 S.Ct. 2510, 138 L.Ed.2d 1013 (1997); *Stephens v. Johnson,* 83 F.3d 198, 200 (8th Cir.1996); *Haynes v. Bee–Line Trucking Co.,* 80 F.3d 1235, 1238 (8th Cir.1996); *Nelson v. Boatmen's Bancshares, Inc.,* 26 F.3d 796, 800 (8th Cir.1994); *McAnally v. Gildersleeve,* 16 F.3d 1493, 1500 (8th Cir.1994). "Postverdict judgment as a matter of law is appropriate only when the evidence is entirely insufficient to support the verdict." *Top of Iowa Co-op. v. Schewe,* 324 F.3d 627, 633 (8th Cir.2003) (citations omitted); *see also Manus v. American Airlines, Inc.,* 314 F.3d 968, 972 (8th Cir.2003) (" 'Judgment as a matter of law is appropriate only when all of the evidence points one way and is susceptible of no reasonable inference sustaining the position of the nonmoving party.' ") (quoting *Belk v. City of Eldon,* 228 F.3d 872, 877 (8th Cir. 2000)). It is imperative that while the

court is required to draw all reasonable inferences in favor of the nonmoving party, the court *may not* "make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 135, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). The jury verdict is accorded substantial deference, *see Tilson v. Forrest City Police Dep't,* 28 F.3d 802, 806 (8th Cir.1994), *cert. denied,* 514 U.S. 1004, 115 S.Ct. 1315, 131 L.Ed.2d 196 (1995), and must be affirmed " 'unless viewing the evidence in the light most favorable to the prevailing party, [the court] concludes that a reasonable jury could have not found for that party.' " *Stockmen's Livestock Mkt., Inc. v. Norwest Bank of Sioux City,* 135 F.3d 1236, 1240–41 (8th Cir.1998) (quoting *Chi. Title Ins. Co. v. Resolution Trust Corp.,* 53 F.3d 899, 904 (8th Cir.1995)).

■ While the court would normally apply the above recited standards to the defendant's Rule 50 motion without further ado, the court must first address a matter raised by neither party: the fact that the defendant failed to comply with the requirements of Rule 50. At the end of the plaintiffs' case, the defendant moved for what the defendant called a 'motion to dismiss' in which the defendant requested dismissal of the case on the grounds that the plaintiffs had made no showing of intentional discrimination on the part of Mr. Kasotakis d/b/a The Horizons Family Restaurant, and further that the plaintiffs presented no evidence of any damages they suffered as a result of the defendant's acts. The court considered this argument and denied the defendant's motion. Assuming that the defendant's so styled oral 'motion to dismiss' constitutes adherence to Rule 50's requirements, the fact remains that the *defendant never renewed its motion before the submission of the case to the jury* as required by Rule 50(b). *See* Fed. R. Civ. P. 50(b) (allowing post-trial motion for judgment as a matter of law where "the court does not grant a motion for judgment as a matter of law made at the close of all the evidence").

■ The Eighth Circuit Court of Appeals has remained adamant in holding that judgment as a matter of law is *unavailable* to a party that fails to renew its motion:

It is well established that judgment as a matter of law following a jury verdict cannot be had by a party who fails to renew its motion, pursuant to rule 50(b), at the close of all the evidence. Interpretation of Rule 50(b) is set out by the Advisory Committee. *See* Fed. R. Civ. P. 50(b) advisory committee's note (1963 Amendment) ("A motion for judgment notwithstanding the verdict will not lie unless it was preceded by a motion for a directed verdict made at the close of all the evidence."); Fed. R. Civ. P. 50(b) advisory committee's note (1991 Amendment) ("This provisions retains the concept of the former rule that the post-verdict motion is a renewal of an earlier motion made at the close of the evidence."). This interpretation is cited by recognized authorities on federal practice and procedure. *See* 9 James Wm. Moore, et al., *Moore's Federal Practice* §§ 50.20[3], 50.40[1]. 50.91[1] (3d ed.2001). It is unanimously approved by the courts, including this circuit. *See, e.g., Jackson v. City of St. Louis,* 220 F.3d 894, 896 (8th Cir.2000); *Duckworth v. Ford,* 83 F.3d 999, 1001 (8th Cir.1996); *Pulla v. Amoco Oil Co.,* 72 F.3d 648, 655 (8th Cir.1995).

*Mathieu v. Gopher News Co.,* 273 F.3d 769, 776 (8th Cir.2001). Further, a motion for judgment as a matter of law *must* specifically state the grounds and facts upon which the party is entitled to judgment:

"[T]he purpose of requiring the moving party to articulate the ground on which JMOL is sought 'is to give the other

party an opportunity to cure the defects in proof that might otherwise preclude him from taking the case to the jury.'" *Galdieri–Ambrosini [v. Nat'l Realty & Dev. Corp.]*, 136 F.3d [276], 286 [ (2d Cir.1998) ] (citations omitted). If specificity is lacking, judgment as a matter of law may neither be granted by the district court nor upheld on appeal unless that result is "required to prevent manifest injustice." *Cruz v. Local Union No. 3 of the Int'l Bhd. of Elec. Workers*, 34 F.3d 1148, 1155 (2d Cir.1994). "'[T]echnical precision is not necessary in stating grounds for the motion so long as the trial court is aware of the movant's position.'" *Rockport Pharm., Inc. v. Digital Simplistics, Inc.*, 53 F.3d 195, 197–98 (8th Cir.1995) (quoting *Cortez v. Life Ins. Co. of N. Am.*, 408 F.2d 500, 503 (8th Cir.1969)). If colloquy between counsel and the trial court fleshes out the motion, it may provide the opposing party with the requisite notice. *Galdieri–Ambrosini*, 136 F.3d at 287. However, post-trial motion for judgment "may not advance additional grounds that were not raised in the pre-verdict motion." *Rockport Pharm.*, 53 F.3d at 197.

*Walsh v. Nat'l Computer Sys., Inc.*, 332 F.3d 1150, 1158 (8th Cir.2003). The Eighth Circuit Court of Appeals favors strict compliance with the requirements of Rule 50, *see Walsh*, 332 F.3d at 1158 ("Adherence to the rule is mandatory."); *Mathieu*, 273 F.3d at 777 ("Strict adherence to the rule comports with its underlying policy of preventing questions concerning compliance with the Seventh Amendment."), and has on various occasions rejected proposed exceptions to this rule. *See Mathieu*, 273 F.3d at 777 (rejecting the following proposed exception that would excuse technical noncompliance with Rule 50(b) where the purposes of the Rule are satisfied); *Peerless Corp. v. United States*, 185 F.3d 922, 927 (8th Cir. 1999) (rejecting exception that would "excuse an untimely motion submitted to the trial court after the jury has departed the courtroom, and with it the non-moving party's final opportunity to 'cure any deficiency in that party's proof.'") (citing FED. R. CIV. P. 50(a)(2) advisory committee notes to 1991 Amendment); *Pulla v. Amoco Oil Co.*, 72 F.3d 648, 655 n. 9 (8th Cir.1995) (noting that the Eighth Circuit has not adopted an exception to Rule 50 which "allows litigants, post-trial, to move for judgment as a matter of law even thought they failed to file a Rule 50 motion at the close of the evidence where (1) an earlier such motion has been filed and the district court defers ruling on the motion; (2) no other evidence related to the claim is presented after the motion; and (3) very little time passes between the original assertion and the close of defendant's case."). The defendant never once made the argument it asserts in its post-trial motion at any point prior to trial, during trial, or after all the evidence was submitted. The defendant neither filed a dispositive motion asserting the agency argument it makes today nor asserted agency principles as precluding the imposition of punitive damages against The Horizons Family Restaurant in its trial brief.[15] *Cf. Walsh*, 332 F.3d at 1159 (find-

---

**15.** Indeed, the only mention of punitive damages in the defendant's trial brief centers around how the defendant's actions did not rise to the requisite level required to support a finding of punitive damages:

> **The conduct of the Defendants was not intentional and reckless so as to allow for a finding of punitive damages.**

The Defendants deny any employee of the Horizon Restaurant uttered any racially insensitive remarks to the Plaintiffs. Accordingly, any services of which the Plaintiffs were denied had nothing to do with the Plaintiffs' race, but was merely poor business practice. Nick Kasotakis, the owner of the Horizon Restaurant will testify he trains his employees to treat all paying cus-

ing that defendant's summary judgment motion adequately apprised the plaintiff and the court of the defendant's legal position regarding most of the plaintiff's claims, and as to those claims defendant's motion for judgment as a matter of law could be considered). Nor did the defendant submit the argument at the final pre-trial conference—as there is no inkling of it in the Final Pre–Trial Order. *See Hale v. Firestone Tire & Rubber Co.,* 756 F.2d 1322, 1335 (8th Cir.1985) (noting that "a party may not offer evidence or *advance theories* during trial which violate the terms of the pretrial order"). The defendant also failed to object to the jury instructions compiled by the court. Likewise, nothing remotely resembling a colloquy between defendant's counsel and the court occurred, at any point, that could be viewed as fleshing out the argument the defendant proffers for the first time in its post-trial motion. Not until the filing of its post-trial motion for partial judgment as a matter of law was the court, or the opposing party for that matter, apprised of the defendant's argument that it could not be held liable for its employee's illegal acts under agency law principles. The defendant *clearly* did not comply with the mandates of Rule 50.

■ Despite the Eighth Circuit's reluctance to adopt exceptions to the requirements of Rule 50, it has recognized two exceptions. The first exception allows litigants to challenge a jury verdict without moving for judgment as a matter of law at the close of the evidence if: (1) their earlier Rule 50 motion closely preceded the close of all of the evidence; and (2) the court somehow indicated that the movant need not renew its motion in order to preserve its right to challenge the verdict. *BE & K Constr. Co. v. United Bhd. of*

*Carpenters and Joiners of Am., AFL–CIO,* 90 F.3d 1318, 1325 (8th Cir.1996); *Pulla,* 72 F.3d at 655; *Halsell v. Kimberly–Clark Corp.,* 683 F.2d 285, 294 (8th Cir.1982), *cert. denied,* 459 U.S. 1205, 103 S.Ct. 1194, 75 L.Ed.2d 438 (1983); *United States v. 353 Cases Mountain Valley Mineral Water,* 247 F.2d 473, 477 (8th Cir.1957). The second exception is "where allowing such claims would constitute plain error resulting in a manifest miscarriage of justice." *BE & K Const. Co.,* 90 F.3d at 1325; *see Jones v. St. Clair,* 804 F.2d 478, 479–80 (8th Cir.1986); *353 Cases,* 247 F.2d at 477. Because neither party brought up the issue of the defendant's failure to renew its motion for judgment as a matter of law at the close of the evidence, there is no assertion that either of the exceptions recognized by the Eighth Circuit applies in this matter. It is clear, looking at the plain facts of the situation, that the first exception does not apply—for while the Rule 50 motion by the defendant at the close of the plaintiffs' case closely preceded the close of the evidence, the court in no way indicated that the defendant need not renew its motion at the close of the evidence to preserve its right to post-trial relief under Rule 50. The court is strictly limited in this situation and "cannot test the sufficiency of the evidence to support the jury's verdict beyond application of the 'plain error' doctrine in order to prevent a manifest miscarriage of justice." *Karjala v. Johns–Manville Prods. Corp.,* 523 F.2d 155, 157 (8th Cir.1975) (citing *United States v. Harrell,* 133 F.2d 504, 506–07 (8th Cir.1943)). As the defendant failed to renew its motion for judgment as a matter of law, before submission of the case to the jury, the court can only test the sufficiency of the evidence to support the jury's verdict under the "plain error doctrine."

tomers alike. The Horizon Restaurant does not discriminate and seeks to serve as many customers daily as possible.

Defendant's Trial Brief, Doc. No. 13, at 3–4.

*Cross v. Cleaver,* 142 F.3d 1059, 1069–70 (8th Cir.1998).

### b. *Rule 51*

Alternatively, the defendant's argument that agency law precludes the imposition of punitive damages on The Horizons Family Restaurant could also be viewed as an attack on the court's instruction to the jury regarding punitive damages—which is how the plaintiffs viewed the defendant's argument in their response to the defendant's partial motion for judgment as a matter of law. Before looking at the relevant law, the court will establish the facts surrounding the issuance of jury instructions in this matter. On February 5, 2004, the parties jointly submitted proposed preliminary and final instructions—captioned "Parties Unified Proposed Preliminary and Final Instructions to the Jury." (Doc. No. 11). Upon review, the court noted that the parties' proposed instructions were cast in terms of 42 U.S.C. § 2000a—which was problematic to the court as Section 2000a only provides for injunctive relief, even though the plaintiffs sought compensatory and punitive damages. As the parties apparently agreed that all three claims boiled down to race discrimination in a public accommodation, and all of the claims involved essentially the same elements, the court recast the instructions in terms of Section 1981 and filed and submitted new Proposed Preliminary and Final Instructions to the parties along with a letter detailing the legal reasoning behind the court's changes. (Doc. No. 15). The court, in its letter to counsel, addressed the 'preliminary matter' of the basis for an employer's liability under § 1981 as follows:

Another "preliminary matter" is an issue mentioned in the parties' proffers, but never explained, which is the basis for an employer's liability under § 1981 for discriminatory conduct by employees. It appears from the par-

ties' submissions and briefs that they do not dispute that Mr. Kasotakis will be liable for discriminatory conduct of his employees on the basis that the employees were acting within the scope of their employment. *See Arguello [v. Conoco, Inc.],* 207 F.3d [803,] 803 [ (5th Cir.2000) ] (discussing employer liability under § 1981 for conduct of employees based on "agency" and "scope of employment" and *inter alia,* rejecting application of the *Ellerth/Faragher* affirmative defense to § 1981 claims in the "public accommodation" context, because the supervisory status of the discriminating employee is much less relevant than it is in the context of employment discrimination).

Court's Letter to Counsel Regarding the Court's Proposed Statement of the Case and Proposed Jury Instructions in *Sherman v. Kasotakis,* Case No. C 02–4047–MWB (N.D.Iowa) (02/13/04 VERSION), Doc. No. 15–2, at 3. The accompanying order gave the parties until 5:00 p.m. on Monday, February 16, 2004, to file any objections to the court's proposed instructions or any different or additional instructions. (Doc. No. 15–1). Neither party filed any objections, or requests for additional or different instructions. On the morning of trial, before the trial commenced, the court gave both parties the opportunity, on the record, to make any objections they might have to the court's proposed preliminary and final instructions—neither party objected and the preliminary instructions as drafted by the court were read to the jury. The court again gave the parties the opportunity to object, on the record, to the instructions after the submission of all the evidence but before the final instructions were read to the jury—again, there were no objections by either party and the final jury instruc-

tions were read to the jury as drafted by the court.

■ Federal Rule of Civil Procedure 51 governs jury instructions in a federal civil case. Under Rule 51, objections to jury instructions must be made on the record, state the matter objected to, and give the specific grounds upon which the objection is based. *See Dupre v. Fru–Con Eng'g, Inc.*, 112 F.3d 329, 334 (8th Cir.1997) ("*Our law on the subject is crystal clear:* to preserve an argument concerning a jury instruction for appellate review, a party must state distinctly the matter objected to and the grounds for the objection on the record.") (emphasis added). For the objection to be timely the party must object "to the proposed instructions and actions ... before the instructions and arguments are delivered." FED. R. CIV. P. 51(b) & (c)(2)(A); *see Walsh*, 332 F.3d at 1159 ("No party may assign as error the giving or the failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection."); *Phillips v. Parke, Davis & Co.* 869 F.2d 407, 409 (8th Cir.1989) ("Rule 51 makes it incumbent upon the attorneys in a civil case to ascertain how the jury is to be instructed and to state any objections before the jury retires."). Where the party did not timely, or specifically, object to the jury instructions given—or, as in this case, where the defendant did not object *at all*—only a plain error analysis is required. *See* FED. R. CIV. P. 51(d)(2) ("A court may consider a plain error in the instructions affecting substantial rights that has not been preserved as required by Rule 51(d)(1)(A) or (B)."); *Cross*, 142 F.3d at 1068 ("Where an appellant has failed to make an adequate objection below to preserve the purported error in instructions ... this court reviews only for 'plain error.' "); *Farmland Indus. v. Frazier–Parrott Commodities, Inc.*, 871 F.2d 1402, 1408 (8th Cir.1989) (holding that only a plain error analysis is necessary where party "never objected on the record to the court's failure" to give the requested instructions). Because the defendant failed to object, the review of this issue is limited to the plain error standard of review.

### 3. Plain Error Review

The defendant's failure to comply with the requirements of Rule 50 and Rule 51 has caused the defendant to forfeit review under the normal standards prescribed by those rules, and has instead relegated the issues raised by the defendant in its partial motion for judgment as a matter of law to review only for plain error. " 'Plain error review is narrow and confined to the exceptional case where error has seriously affected the fairness, integrity, or public reputation of the judicial proceedings. The verdict should be reversed only if the error prejudices the substantial rights of a party and would result in a miscarriage of justice if left uncorrected.' " *BBSerCo, Inc. v. Metrix Co.*, 324 F.3d 955, (8th Cir.2003) (quoting *Chem–Trend, Inc. v. Newport Indus., Inc.*, 279 F.3d 625, 629 (8th Cir.2002) (internal citations and quotations omitted)); *see also Bd. of Water Works Trs. of City of Des Moines, Iowa v. Alvord, Burdick & Howson & Dorr-Oliver*, 706 F.2d 820, 824 (8th Cir.1983) (stating that plain error review is "narrow and confined to the exceptional cases where error has seriously affected the fairness, integrity, or public reputation of the judicial proceedings."); *Christopherson v. Deere & Co.*, 941 F.2d 692, 694 (8th Cir. 1991) ("[A]ny plain error exception to compliance with Rule 51 is confined to the exceptional case where error has seriously affected the fairness, integrity or public reputation of judicial proceedings") (citations omitted). Plain error is present "only if the error prejudices the substantial rights of a party and would result in a

miscarriage of justice if left uncorrected." *Rush v. Smith,* 56 F.3d 918, 922 (8th Cir.), *cert. denied,* 516 U.S. 959, 116 S.Ct. 409, 133 L.Ed.2d 328 (1995); *see also Allen v. Entergy Corp., Inc.,* 193 F.3d 1010, 1014 (8th Cir.1999); *Johnson v. Ashby,* 808 F.2d 676, 679 n. 3 (8th Cir.1987).

### a. Employer liability

The court turns first to a plain error review of the defendant's motion for partial judgment as a matter of law. Because the defendant's argument that agency principles preclude imposition of liability for the acts of its employee is based on the holding of *Kolstad,* that is where the court shall begin its plain error analysis. In *Kolstad* the United States Supreme Court looked to agency principles for assistance in determining when, in a Title VII case, punitive damages could be imputed to the employer for the misconduct of an employee. *Kolstad,* 527 U.S. at 542, 119 S.Ct. 2118. The Court recognized, as the defendant points out, that the Restatement of Agency holds the principal liable for punitive damages due to the acts of an agent in four situations, and four situations only:

(a) the principal authorized the doing and the manner of the act, or

(b) the agent was unfit and the principal was reckless in employing him, or

(c) the agent was employed in a managerial capacity and was acting in the scope of employment, or

(d) the principal or a managerial agent of the principal ratified or approved the act.

*Id.* at 542–43, 119 S.Ct. 2118 (quoting RESTATEMENT (SECOND) OF AGENCY § 217C (1957)). However, the Court goes on, in *Kolstad,* to evaluate the position taken by the Restatement in light of the purposes of Title VII—resulting in a modification of the Restatement's perception of "scope of employment" in order to avoid undermining the objectives of Title VII. *Id.* at

543–46, 119 S.Ct. 2118. Ultimately, the Court adopted a "good-faith" defense which immunizes an employer from vicarious liability for punitive damages "for the discriminatory employment decisions of managerial agents where these decisions are contrary to the employer's 'good-faith efforts to comply with Title VII.'" *Id.* at 545, 119 S.Ct. 2118 (quoting *Kolstad v. Am. Dental Ass'n,* 139 F.3d 958, 974 (D.D.C.1998) (Tatel, J., dissenting)).

The court believes that the plaintiffs have a valid contention—that the standards for imposing liability against an employer for the acts of an employee differ depending on the context of the case. This case is a *consumer case* not an employment discrimination case. The court agrees with the logic employed by the Fifth Circuit Court of Appeals in *Arguello v. Conoco, Inc.,* 207 F.3d 803 (5th Cir.2000) in rejecting the application of the *Ellerth/Faragher* restrictions on employer liability in employment cases to a consumer action under § 1981:

In a public accommodation case such as this, the supervisory status of the discriminating employee is much less relevant than it is in an employment discrimination case....

\*       \*       \*       \*       \*       \*

Also, in a public accommodation case under § 1981, a rule that only actions by supervisors are imputed to the employer would result, in most cases, in a no liability rule. Unlike the employment context it is rare that in a public accommodation settings (sic) a consumer will be mistreated by a manager or supervisor. Most consumer encounters are between consumers and clerks who are non-supervisory employees.

*Arguello,* 207 F.3d at 810. The *Arguello* court applied the general agency principle, embodied in the RESTATEMENT (SECOND) OF AGENCY § 219, that a master is subject to

liability for the torts of his servants while acting in the scope of their employment—and then looked to case law and treatises discussing RESTATEMENT (SECOND) OF AGENCY § 228 (detailing when conduct is within the scope of employment) to arrive at a set of factors courts are to consider in determining when an employee's acts are within the scope of employment. *Id.* at 810 (citing *Domar v. Ocean Transp. Ltd. v. Indep. Refining Co.*, 783 F.2d 1185, 1190 (5th Cir.1986)). However, *Arguello* dealt only with the imposition of liability on the employer in a § 1981 action—not specifically with the issue at hand here, which is not whether basic liability can be imposed, but rather if punitive damages can be assessed against an employer for the intentional discriminatory acts of its non-supervisory/non-managerial employee.

The court is unable to find any case which sets forth the correct standards to use in determining whether *punitive damages* can be imposed against an employer for the intentional acts of a non-supervisory employee in a § 1981 *consumer* case. It is understood that principles of agency govern the imposition of liability on a employer for the acts of an employee in a § 1981 case. *See Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 392, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982) (requiring an agency relationship before liability could be assessed in § 1981 action). Looking to the RESTATEMENT (SECOND) OF AGENCY the court comes full circle to the instances enumerated in RESTATEMENT (SECOND) OF AGENCY § 217C for when punitive damages can properly be awarded against an employee. Just as the *Kolstad* Court looked to the purposes of Title VII in modifying those factors, it is likely that the factors would also be so modified to fit the purposes of § 1981 in a consumer case. The *Arguello* court recognized a truism of public accommodation cases when it stated that "a rule that only actions by supervisors are imputed to the

employer would result, in most cases, in a no liability rule." *Arguello*, 207 F.3d at 810. Based on this truism it is likely that the language restricting the intentional conduct to managerial employees in RESTATEMENT (SECOND) OF AGENCY § 217C (c) & (d) would be redacted when applied to public accommodation § 1981 cases—thus making an employer liable where the agent was acting in the scope of employment. If this were the case, the facts would clearly support the imposition of punitive damages against the defendant in this case.

However, the court need not delineate a dispositive set of factors for determining when an employer should be vicariously liable for punitive damages for the torts of a non-managerial employee at this juncture. The court submits that, viewing the facts in the light most favorable to the plaintiffs, the evidence supports the imposition of punitive damages against the defendant for its non-supervisory employee's intentional conduct under RESTATEMENT (SECOND) OF AGENCY § 217C without modification. Particularly the last option which allows for the imposition of punitive damages where "the principal or the managerial agent of the principal ratified or approved of the act." RESTATEMENT (SECOND) OF AGENCY § 217C(d); *see* RESTATEMENT (FIRST) OF TORTS § 909(d) (1939) (allowing punitive damages against an employer where the employer or manager of the employer ratified or approved of the act). The defendant asserts that liability in the form of punitive damages cannot be levied against it under this alternative because "there was no evidence whatsoever that Mr. Kasotakis ratified the actions of his employee in any way." Brief in Support of Defendant's Partial Motion for Judgment as a Matter of Law or in the Alternative, Motion for Partial New Trial or Remittitur of Punitive Damages Verdict and Judgment ("Def.'s Brief"), Doc. No. 26, at 5. The court disagrees. First, according to

the plaintiffs' testimony, in addition to the offending waiter and the police officer, there was also a 'supervisor' present at The Horizons Family Restaurant at the time of the incident on June 23, 2001. It is clear that Mr. Kasotakis was not personally present at the time of the incident—therefore, the supervisor that was present would be something akin to a 'night manager.' The supervisor allegedly did nothing to stop the incident from occurring. After the incident occurred and the plaintiffs were seated, two individuals working in the kitchen came out and approached the supervisor asking him how long he would continue to tolerate this kind of conduct out of the offending waiter, referencing the fact that this waiter had treated minority employees in this manner before. The supervisor then got up and approached the plaintiffs table, offered them a free meal, and told them the waiter's conduct was unacceptable and that he would take care of the problem that very instant. The plaintiffs did receive a free meal, but during the duration of the plaintiffs' stay at The Horizons Family Restaurant they did not once see the supervisor approach the waiter about his conduct—as a matter of fact, the waiter continued to perform all of his job functions throughout the time that the plaintiffs remained. Mr. Kasotakis claimed at trial that he was unaware, until he was notified of the filing of a civil rights complaint by the plaintiffs, that the incident was racially based. However, when questioned on the stand, Mr. Kasotakis stated that he talked with the waiter and the supervisor the next morning—but could not give an explanation as to why, if he knew nothing of the nature of the incident, that he felt compelled to seek out this conversation. The jury could, and likely did, infer from this dubious testimo-ny that Mr. Kasotakis either knew, or purposefully chose to disregard, the nature of the incident. Further, though Mr. Kasotakis claimed that a verbal warning for poor service was given to the waiter, there was no evidence presented to corroborate this assertion, nor was there evidence that any remedial action whatsoever was taken to prevent this kind of incident from reoccurring. While it is clear that the "mere failure to dismiss a servant, unaccompanied by conduct indicating approval of the wrongful conduct, is not a sufficient basis on which to impose punitive damages," RESTATEMENT (SECOND) OF AGENCY § 217C cmt. b, there was evidence in this case from which the jury could infer that the supervisor's conduct (i.e. the managerial agent's conduct) at the time of the incident, and Mr. Kasotakis's failure to address the conduct, amounted to a ratification or approval of the conduct by the defendant and/or by a manager of the employer. See RESTATEMENT (FIRST) OF TORTS § 909(d). The comments to the RESTATEMENT (FIRST) OF TORTS § 909, to which RESTATEMENT (SECOND) OF AGENCY § 217C references for comments and illustrations when assessing the liability of an employer, states:

> Although *there is no fault* on the part of a corporation or other employer, where a person acting in a managerial capacity either does an outrageous act *or approves of such an act* by a subordinate, the imposition of punitive damages upon the employer serves as a deterrent to the employment of unfit persons for important positions . . . .

RESTATEMENT (FIRST) OF TORTS § 909 cmt. a (emphasis added). Therefore, even if Mr. Kasotakis is completely innocent in the matter, the fact that the supervisor/night manager [16] acted in such a way to signal

---

**16.** The court has no concerns with labeling the supervisor as a "manager" of the defendant as he was vested with the authority to authorize free meals, and purported to have the authority to fire the offending waiter.

ratification or approval of the waiter's conduct is sufficient to impose punitive damages liability against the defendant. It is evident that the jury's verdict imposing punitive damages against the defendant did not amount to plain error.

### b. Jury instructions

The court now turns to a plain error analysis of the defendant's inferred motion for partial judgment as a matter of law insofar as it implicates the instructions given to the jury. With regard to instructing a jury, the Eighth Circuit Court of Appeals has stated:

The trial court has "broad discretion" in instructing the jury. *Ryther v. KARE 11*, 108 F.3d 832, 846 (8th Cir.1997) (en banc) (citing *Hastings v. Boston Mut. Life Ins. Co.*, 975 F.2d 506, 510 (8th Cir.1992)), *cert. denied*, 521 U.S. 1119, 117 S.Ct. 2510, 138 L.Ed.2d 1013 (1997). Instructions do not need to be technically perfect or even a model of clarity. *Id.* Rather, "[i]n reviewing jury instructions, this court must 'determine whether the instruction[s] fairly and adequately state[ ] the applicable law when reading the instructions as a whole.'" *Stockmen's Livestock Mkt., Inc.*, 135 F.3d at 1245–46 (quoting *First Dakota Nat'l Bank v. St. Paul Fire & Marine Ins. Co.*, 2 F.3d 801, 813 (8th Cir.1993)); *Dupre v. Fru–Con Eng'g, Inc.*, 112 F.3d 329, 335 (8th Cir.1997) (" '[W]hen reviewing a claim of instructional error, we consider the instructions in their entirety and determine whether, when read as a whole, the charge fairly and adequately submits the issues to the jury,' " quoting *Laubach v. Otis Elevator Co.*, 37 F.3d 427, 429 (8th Cir.1994)); *Slathar v. Sather Trucking Corp.*, 78 F.3d 415, 418 (8th Cir.) (stating this standard of review), *cert. denied*, 519 U.S. 867, 117 S.Ct. 179, 136 L.Ed.2d 118 (1996). Furthermore, before an appellant is entitled to any relief on the ground that the trial court erred in giving or not giving an instruction, the error must be prejudicial. *Id.; Dupre*, 112 F.3d at 336; *Walker v. AT & T Techs.*, 995 F.2d 846, 849 (8th Cir.1993).

*Cross*, 142 F.3d at 1067–68. As discussed above, as the defendant has failed to preserve any objection it may have to the jury instructions, the court will review the jury instructions submitted only for plain error. Under plain error review, the defendant must show that the instructions given by this court constituted an "error affecting substantial rights," that the error was "plain," and that the error seriously affected "the fairness, integrity or public reputation of judicial proceedings." *Caviness v. Nucor–Yamato Steel Co.*, 105 F.3d 1216, 1220 (8th Cir.1997) (internal quotations omitted).

At trial, Final Jury Instruction No. 2 instructed the jury on the elements of the plaintiffs' claims:

Each of the plaintiffs contends that his treatment at The Horizons Family Restaurant on or about June 23, 2001, violated federal law, because it deprived him of the same right to contract for the services of the restaurant as is enjoyed by white citizens. To win his claim of "racial discrimination in services of a public restaurant," each plaintiff must prove the following elements by the greater weight of the evidence:

*One*, the plaintiff is a member of a "protected class."

The statute upon which each plaintiff bases his claim provides that all customers of a restaurant are entitled to the same treatment as "white citizens." Therefore, to establish his claim, the plaintiff must be a member of a "protected class," such as a non-white racial group. In this case, the parties do not dispute that the plaintiffs, all of whom are African Ameri-

cans, are members of a "protected class" within the meaning of the statute.

*Two,* on or about June 23, 2001, the plaintiff sought the services of The Horizons Family Restaurant.

The parties do not dispute that each of the plaintiffs was present at The Horizons Family Restaurant on the date in question.

*Three,* the plaintiff did not receive the full benefits and services that a reasonable person would expect in that restaurant.

The "right to contract," within the meaning of the statute upon which the plaintiffs base their claims, includes the right to "the enjoyment of benefits, privileges, terms, and conditions of the contractual relationship." More specifically, it includes the right of all customers of a restaurant to receive more than just food. Thus, it includes the right to the same treatment in seating and services, the right to be free from hostile treatment based on race, and the right to be served in an atmosphere that a reasonable person would expect in the chosen place. For example, a plaintiff was deprived of the full benefits and services of the restaurant if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was required to sit in a certain section of the restaurant, while white customers were not.

*Four,* the plaintiff was intentionally deprived of the full benefits and services of the restaurant because of the plaintiff's race.

Each plaintiff must prove that he was subjected to intentional discrimination "because of race." The plaintiff's race need not have been the only reason that he was deprived of the full benefits and services of the restaurant. Rather, his race must have played a part or played a role in the defendant's employees' decision to deprive the plaintiff of the full benefits and services of the restaurant.

You may find that the wrongful treatment of the plaintiff was "because of race" if you find, by the greater weight of the evidence, in light of all of the circumstances, including what was said or done by those present, that a reasonable person would conclude that wrongful treatment was because of the plaintiff's race. You may also find that wrongful treatment was "because of race" if you find, by the greater weight of the evidence, that a legitimate, non-discriminatory reason offered by the defendant for the treatment of the plaintiff is not the true reason, but is instead a pretext to hide discrimination because of the plaintiff's race.

However, you cannot find that the wrongful treatment was "because of race" simply because you find that the conduct of the defendant's employees was poor business practice. Instead, the plaintiff must prove that a reason for the plaintiff's wrongful treatment was the plaintiff's race.

Unless a particular plaintiff proves *all* of these elements by the greater weight of the evidence, your verdict must be for the defendant on that plaintiff's claim. However, if you find that a particular plaintiff has proved *all* of these elements by the greater weight of the evidence, then that plaintiff is entitled to damages in some amount on his claim of racial discrimination in services of a public restaurant.

Preliminary and Final Jury Instructions, Doc. No. 20, at 21–23. Final Jury Instruc-

tion No. 7 instructed the jury as to punitive damages:

> In addition to the "compensatory" or "nominal" damages, described in Final Jury Instruction No. 5 and Final Jury Instruction No. 6, respectively, the law permits the jury, under certain circumstances, to award "punitive damages" in order to punish the defendant for some extraordinary misconduct and to serve as an example or warning to others not to engage in such conduct. Therefore, if you find that a plaintiff has proved his claim of racial discrimination in services of a public restaurant, then you must consider what, if any, punitive damages you should award. Whether or not to award punitive damages, and the amount of such punitive damages, are for you to decide.
>
> You may award punitive damages to a particular plaintiff only if you find that plaintiff has proved the following by the greater weight of the evidence:
>
> *One,* the defendant was callously and recklessly indifferent to the plaintiff's right not to be discriminated against in services of a public restaurant because of his race.
>
>> The defendant was callously and recklessly indifferent if the plaintiff proves by the greater weight of the evidence that the defendant knew that his employees' conduct violated the law prohibiting racial discrimination in a public restaurant, but took no reasonable steps to prevent such conduct, or acted with reckless disregard of that law.
>
> *Two,* it is appropriate to punish the defendant or to deter the defendant and others from permitting like conduct by his employees in the future.
>
> In determining the amount of punitive damages, if any, to award, you should consider how offensive the defendant's employees' conduct was; whether the amount of punitive damages bears a reasonably relationship to the actual damages awarded on a particular plaintiff's claim; what sum is sufficient to deter other similar persons from similar wrongful conduct in the future; any circumstances of mitigation; and what amount is needed, considering the defendant's financial condition, to punish the defendant for his employees' wrongful conduct in the future, although the wealth of the defendant cannot justify an award that is not reasonably related to the offensiveness of the defendant's employees' conduct or out of reasonable proportion to the actual damages awarded to a particular plaintiff. Again, whether or not to award punitive damages, and the amount of such punitive damages, are for you to decide.
>
> You may assess punitive damages in favor or one, some, or all of the plaintiffs, in the same or different amounts, or you may refuse to impose any punitive damages at all, based upon the evidence presented.

Preliminary and Final Jury Instructions, Doc. No. 20, at 28–29.

The instructions fairly and accurately stated the substantive law on the issues in conformity with the Eighth Circuit Model Jury Instructions in civil cases. *See* EIGHTH CIRCUIT MANUAL OF MODEL JURY INSTRUCTIONS: CIVIL § 5.21 (2001) (requiring showing that defendant took some action against the plaintiff, and that plaintiff's race was a motivating factor in the decision to take such action, for the imposition of liability under § 1981); *Id.* § 5.24 (allowing imposition of punitive damages where jury has found that defendant intentionally discriminated against plaintiff based on race or defendant was callously indifferent to the plaintiff's rights—further, stating that whether or not to award punitive damages is in sound discretion of

the jury) (2001). Further, as discussed above, there was no reason for the court to elaborate in the instructions on the circumstances under which the defendant could be liable for punitive damages as both parties represented to the court that they did "not dispute that Mr. Kasotakis [would] be liable for discriminatory conduct of his employees on the basis that the employees were acting within the scope of their employment." Court's Letter to Counsel Regarding the Court's Proposed Statement of the Case and Proposed Jury Instructions in *Sherman v. Kasotakis,* Case No. C 02–4047–MWB (N.D.Iowa) (02/13/04 VERSION), Doc. No. 15–2, at 3. Despite numerous opportunities to do so, the defendant did not object to the instructions as drafted by the court. The instructions appropriately state the substantial rights of the parties, as well as the substantive law on the issues. *Compare Kim v. Nash Finch Co.,* 123 F.3d 1046, (8th Cir.1997) (finding that the standard for punitive damages is the same under Title VII and § 1981—malice or reckless indifference to the plaintiff's federally protected rights), *with* Final Jury Instruction No. 7, Doc. No. 20, at 28–29 ("You may award punitive damages to a particular plaintiff only if you find that plaintiff has proved the following by the greater weight of the evidence ... the defendant was callously and recklessly indifferent to the plaintiff's right not to be discriminated against in services of a public restaurant because of his race."). The court finds no plain error in the manner in which the jury was instructed as to the defendant's liability or as to punitive damages.

As there was no plain error in assessing punitive damages against the defendant for the acts of his agent, nor did plain error exist in the manner in which the jury was instructed, the defendant's motion for partial judgment as a matter of law is **denied.**

### B. Motion For Partial New Trial or Remittitur

### 1. Standards

### a. Rule 59

Federal Rule of Civil Procedure 59, entitled "New Trials; Amendment of Judgments," states, in relevant part, as follows:

> (a) **Grounds.** A new trial may be granted to all or any of the parties and on all or part of the issues (1) in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts in the United States....

FED. R. CIV. P. 59(a). Regarding motions for new trial under Federal Rule of Civil Procedure 59, the Eighth Circuit Court of Appeals in *White v. Pence,* 961 F.2d 776 (8th Cir.1992) observed:

> With respect to motions for new trial on the question of whether the verdict is against the weight of the evidence, we have stated: "In determining whether a verdict is against the weight of the evidence, the trial court can rely on its own reading of the evidence—it can 'weigh the evidence, disbelieve witnesses, and grant a new trial even where there is substantial evidence to sustain a verdict.'" *Ryan v. McDonough Power Equip.,* 734 F.2d 385, 387 (8th Cir.1984) (citation omitted). Similar language appears in *Brown [ex rel. Brown v. Syntex Labs., Inc.],* 755 F.2d [668,] 671–73 [ (8th Cir.1985) ]; *Slatton [v. Martin K. Eby Constr. Co.],* 506 F.2d [505], 508 n. 4 [ (8th Cir.1974), *cert. denied,* 421 U.S. 931, 95 S.Ct. 1657, 44 L.Ed.2d 88 (1975) ]; *Bates [v. Hensley],* 414 F.2d [1006], 1011 [ (8th Cir.1969) ], and early authority cited in *Bates. See also Leichihman v. Pickwick Int'l,* 814 F.2d 1263, 1266 (8th Cir.), *cert. denied,* 484 U.S.

855, 108 S.Ct. 161, 98 L.Ed.2d 116 (1987). These cases establish the fundamental process or methodology to be applied by the district court in considering new trial motions and are in contrast to those procedures governing motions for j.n.o.v.

*Id.* at 780. Thus, the court in *Pence* concluded the district court may grant a new trial on the basis that the verdict is against the weight of the evidence, if the first trial results in a miscarriage of justice. *Id.; see also Ogden v. Wax Works, Inc.,* 214 F.3d 999, 1010 (8th Cir.2000) (stating that a motion for new trial should only be granted if the jury's verdict was against the great weight of the evidence so as to constitute a miscarriage of justice) (citation omitted); *Shaffer v. Wilkes,* 65 F.3d 115, 117 (8th Cir.1995) (citing *Pence* for this standard); *Nelson,* 26 F.3d at 800 (stating "[a] motion for new trial should be granted if, after weighing the evidence, a district court concludes that the jury's verdict amounts to a miscarriage of justice."); *Jacobs Mfg. Co. v. Sam Brown Co.,* 19 F.3d 1259, 1266 (8th Cir.) (observing that the correct standard for new trial is the conclusion that "the [jury's] verdict was against the 'great weight' of the evidence, so that granting a new trial would prevent a miscarriage of justice."), *cert. denied,* 513 U.S. 989, 115 S.Ct. 487, 130 L.Ed.2d 399 (1994).

■ Though the defendant's motion for a partial new trial argues *only* that the punitive damages award was excessive as a matter of law, and does not seek a new trial on the grounds that the jury's findings were against the great weight of the evidence, "[d]istrict courts must undertake an independent review of the evidence to determine whether it supports punitive damages." *Gorman v. Easley,* 257 F.3d 738, 749 (8th Cir.2001), *rev'd on other grounds, sub. nom.Barnes v. Gorman,* 536 U.S. 181, 122 S.Ct. 2097, 153 L.Ed.2d 230 (2002).

### b. Constitutionally excessive verdict v. remittitur

Before analyzing the issues at hand, the court would like to take a moment to clarify the differences between two of the remedies requested by the defendant: a reduction in the punitive damages award to comport with due process and a remittitur. As the Eleventh Circuit Court of Appeals has aptly explained:

A constitutionally reduced verdict ... is really not a remittitur at all. A remittitur is a substitution of the court's judgment for that of the jury regarding the appropriate award of damages. The court orders a remittitur when it believes the jury's award is *unreasonable* on the facts. A constitutional reduction, on the other hand, is a determination that the law does not permit the award. Unlike a remittitur, which is discretionary with the court ... a court has a mandatory duty to correct an unconstitutionally excessive verdict so that it conforms to the requirements of the due process clause.

*Johansen v. Combustion Eng'g, Inc.,* 170 F.3d 1320, 1331–32 (11th Cir.), *cert. denied,* 528 U.S. 931, 120 S.Ct. 329, 145 L.Ed.2d 256 (1999) (emphasis in original).

■ A district court has a mandatory duty to correct unconstitutionally excessive verdicts to conform with the requirements of the due process clause. *Ross v. Kansas City Power & Light Co.,* 293 F.3d 1041, 1048 (8th Cir.2002) (citing *BMW of N. Am., Inc. v. Gore,* 517 U.S. 559, 572–74, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996)). Reasonableness of a punitive damages award requires evaluation of the factors enumerated in *BMW of North America, Inc. v. Gore,* 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996): the degree of reprehensibility of the defendant's conduct; the ratio or relationship between actual harm inflicted on the plaintiff and

the punitive damages award; and civil penalties authorized for comparable misconduct. *Id.* at 575, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809. Also instructive is the Supreme Court's revisit of *Gore* in the recent case of *State Farm Mutual Automobile Insurance Company v. Campbell*, 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003).[17] As the court has the power, without the permission of the parties, to enter judgment for an amount consistent with the constitutional limit on an award of punitive damages—it follows that the court, in reducing a constitutionally excessive award, "proceeds under Rule 50, not Rule 59, in the entry of judgment for a constitutionally reduced award." *Johansen*, 170 F.3d at 1331. The court need not obtain the consent of the plaintiff in order to reduce the award—the court's duty in this respect is independent of the Seventh Amendment constraints on the plaintiff's right to consent to a remittitur. *Ross*, 293 F.3d at 1049–50. Technically, a reduction of an excessive punitive damages award that violates due process is not a remittitur. *See id.* at 1049 ("[W]hile perhaps labeled as such, the action the district court took was not actually a remittitur, but instead was simply a reduction of the excessive punitive damages award in conformity with constitutional limits."); *Callantine v. Staff Builders, Inc.*, 271 F.3d 1124, 1134 (8th Cir.2001) (scrutinizing a punitive damages award under the *Gore* factors, and reducing such award for unconstitutional excessiveness, though labeling the reduction a remittitur).

▬▬▬ In contrast, a remittitur is ordered "only when the verdict is so grossly excessive as to shock the conscience of the court." *Ouachita Nat'l Bank v. Tosco Corp.*, 716 F.2d 485, 488 (8th Cir.1983); *see also Foster v. Time Warner Entm't Co.*,

L.P., 250 F.3d 1189, 1194 (8th Cir.2001) (stating that a new trial or remittitur is appropriate if the damages are so grossly excessive as to shock the conscience of the court). "A verdict is not considered excessive unless there is 'plain injustice' or a 'monstrous' or 'shocking' result." *Eich v. Bd. of Regents for Cent. Missouri State Univ.*, 350 F.3d 752, 763 (8th Cir.2003) (quoting *Jenkins v. McLean Hotels, Inc.*, 859 F.2d 598, 600 (8th Cir.1988)); *see also Thorne v. Welk Inv., Inc.*, 197 F.3d 1205, 1211 (8th Cir.1999); *Stafford v. Neurological Medicine, Inc.*, 811 F.2d 470, 475 (8th Cir.1987). Generally, "where a punitive damage award is the result of passion and prejudice, a new trial is required and [ ] a remittitur is not an appropriate remedy." *Parsons v. First Investors Corp.*, 122 F.3d 525, 529 (8th Cir.1997) (citation and quotations omitted). "The decision to order a remittitur is circumscribed by the Seventh Amendment." *Thorne v. Welk Inv., Inc.*, 197 F.3d 1205, 1213 (8th Cir.1999). Ordinarily, where the court determines a remittitur to be appropriate, the plaintiff must be given allowed to elect between the judgment as remitted and a new trial. *Id.*

With these concepts in mind, the court turns to each of the three matters to be considered: (1) Was the verdict, with regard to punitive damages, against the greater weight of the evidence?; (2) Should a remittitur be ordered?; and (3) Is the punitive damages award unconstitutionally excessive?

### 2. *New trial*

"When considering whether to grant or deny a motion for new trial, a district court must consider whether the verdict is against the weight of the evidence and if allowing it to stand would result in a miscarriage of justice." *Adzick v. UNUM*

---

**17.** The analysis mandated by these two Supreme Court cases will be discussed in further detail below.

*Life Ins. Co. of Am.,* 351 F.3d 883, 886 (8th Cir.2003) (citing *In re Air Crash at Little Rock, Arkansas, on June 1, 1999,* 291 F.3d 503, 509 (8th Cir.2002)). For a punitive damages award to stand, "[t]he defendant's conduct must be shown to have been 'motivated by evil motive or intent, or ... reckless or callous indifference to the federally protected rights of others.'" *Gorman,* 257 F.3d at 749 (quoting *Smith v. Wade,* 461 U.S. 30, 56, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983)); *Browning v. President Riverboat Casino–Missouri, Inc.,* 139 F.3d 631, 636 (8th Cir.1998) (recognizing that to collect punitive damages under § 1981 the plaintiff must demonstrate that the defendant engaged in discrimination "'with malice or with reckless indifference to [his] federally protected rights.'") (quoting 42 U.S.C. § 1981(b)(1)); *Kim,* 123 F.3d at 1063 (noting that the standard for recovering punitive damages is the same under both Title VII and § 1981). "'Reckless indifference' means that the defendant had 'knowledge that it may be acting in violation of federal law'" *Walsh,* 332 F.3d at 1161 (quoting *Kolstad,* 527 U.S. at 535, 119 S.Ct. 2118), "not its awareness that it is engaging in discrimination." *Otting v. J.C. Penney Co.,* 223 F.3d 704, 711 (8th Cir. 2000). Punitive damages can be upheld where an employer has "deliberately turned a deaf ear to discriminatory conduct." *Walsh,* 332 F.3d at 1161. The court now turns to the question of whether the punitive damages award was against the great weight of the evidence presented at trial.

After reviewing the matter the court finds that the jury's verdict of punitive damages in the amount of $12,500.00 per plaintiff was not against the great weight of the evidence—nor does the award result in a miscarriage of justice. There was evidence presented at trial that would support a finding that the defendant acted with callousness, or reckless indifference, to the plaintiffs' federally protected

right not to be discriminated against in seeking the services of a public accommodation. The plaintiffs testified that after they were seated in the "minority" section of the restaurant two employees went up to the night manager/supervisor and asked him how much longer he was going to tolerate this discriminatory behavior on the part of the offending waiter. Further, the plaintiffs testified that although the supervisor said he would immediately 'take care' of the matter by firing the waiter on the spot—the supervisor never approached the waiter, and in fact, the waiter continued to work throughout the plaintiffs' stay at the restaurant. As discussed *supra* II. A.3.a this acceptance or ratification on the part of an employee vested with managerial or supervisory capacity can be imputed to the defendant. There was also evidence that the defendant knew of the waiter's discriminatory proclivity—Mr. Kasotakis himself testified that he 'assumed,' when he heard there was an incident involving four African American customers, that the incident was racial in nature. Mr. Kasotakis also could give no clear reason as to his motivation for asking if the waiter had called the customers "niggers" or used racially insensitive language, in light of his assertion that no one had told him the incident involved the plaintiffs' race. When asked sensitive or difficult questions on the stand, Mr. Kasotakis became hostile, defensive, and at one point argumentative—the posture of this testimony could reasonably have led the jury to question Mr. Kasotakis's credibility, and disbelieve his explanation of events. Further, the amount of the punitive damages award is not so high that the court would conclude that it was the result of passion and prejudice. *See Parsons,* 122 F.3d at 529. As the verdict was neither against the great weight of the evidence, nor the result of passion and prejudice, the defendant's motion for partial new trial is **denied**. However, even though the defendant's motion

for partial new trial is denied, the court still must consider whether a remittitur is warranted, or whether the punitive damages award is constitutionally excessive in violation of due process.

### 3. Remittitur

Second, the defendant argues that even if its motion for partial judgment as a matter of law and partial motion for new trial are not granted, it is still entitled to a remittitur of the punitive damages award. The defendant relies on all the arguments previously discussed herein as support for this request.

■■■ The Eighth Circuit Court of Appeals has recently discussed when it is appropriate for a district court to order a remittitur:

> In this circuit, a district court should order remittitur "only when the verdict is so grossly excessive as to shock the conscience of the court." *Ouachita Nat'l Bank v. Tosco Corp.*, 716 F.2d 485, 488 (8th Cir.1983). A verdict is not considered excessive unless there is "plain injustice" or a "monstrous" or "shocking" result. *Jenkins v. McLean Hotels, Inc.*, 859 F.2d 598, 600 (8th Cir. 1988).

*Eich v. Bd. of Regents for Cent. Missouri State Univ.*, 350 F.3d 752, 763 (8th Cir.

2003). Whether a verdict is sufficiently outrageous to warrant remittitur is committed to the discretion of the district court. *Benny M. Estes and Assocs., Inc. v. Time Ins. Co.*, 980 F.2d 1228, 1235 (8th Cir.1992); *Hollins v. Powell*, 773 F.2d 191, 197 (8th Cir.1985), *cert. denied*, 475 U.S. 1119, 106 S.Ct. 1635, 90 L.Ed.2d 181 (1986). The grant or denial of a remittitur by the district court is reviewed for abuse of discretion. *Estes*, 980 F.2d at 1235.

■■■ As discussed above, there is sufficient evidence to support the imposition of punitive damages in this case. The amount the jury awarded, $12,500.00 per plaintiff, is only half of the amount of punitive damages requested by the plaintiffs. The amount the jury awarded does not "shock the conscience" of this court, nor is it "monstrous" or "shocking." *See Eich*, 350 F.3d at 763. Therefore, the defendant's motion for a remittitur of the punitive damages award is **denied**.

### 4. Constitutionality

#### a. Standard

The crux of the defendant's argument to eliminate the punitive damages award centers on the assertion that the award is grossly excessive and violates the defendant's substantive due process rights.[18]

---

**18.** The defendant contends that the punitive damages award violates the substantive due process rights bestowed by the Fourteenth Amendment—however, in this matter punitive damages were awarded under a *federal* statute (42 U.S.C. § 1981), so this characterization is not technically correct. The key cases of *State Farm Mutual Automobile Insurance Company v. Campbell*, 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003) and *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996) illustrated how the imposition of damages under state laws, where the punitive damages award was in large part based on conduct outside of that state, could amount to a deprivation of property in violation of the substantive due process clause of the Fourteenth Amendment.

Though the key cases of *State Farm* and *Gore* were decided under the Fourteenth Amendment, as the analysis for substantive due process under the Fifth and Fourteenth Amendment's amounts to a distinction without a difference, courts have employed the *Gore* guideposts in determining the constitutionality of punitive damages awards under federal statutes. *See, e.g., Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020 (9th Cir.2003) (applying the *Gore* guideposts to determine if jury's punitive damages award for violation of § 1981 violated the defendant's due process right to be free from excessive punitive damages), *cert. denied*, —— U.S. ——, 124 S.Ct. 1602, 158 L.Ed.2d 244, 2004 WL 414031 (Mar. 8, 2004); *Hampton v. Dillard Dept.*

Where only nominal and punitive damages are awarded there is some confusion as to the application of the Supreme Court's decisions in *State Farm Mutual Automobile Insurance Company v. Campbell,* 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003), and *BMW of North America, Inc. v. Gore,* 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996). Specifically, questions arise with respect to the second guidepost enunciated in *Gore.* In *Gore* the Supreme Court delineated three guideposts under which a punitive damages award must be evaluated to determine whether it is excessive—the second guidepost involves a proportionality analysis in which the ratio of compensatory damages to punitive damages is evaluated. Generally, the higher the ratio, or disparity, between the compensatory and punitive award the greater the indicia of unreasonableness. *See State Farm,* 538 U.S. at 426–27, 123 S.Ct. at 1525; *Gore,* 517 U.S. at 582, 116 S.Ct. 1589. Some courts have held that such a ratio comparison is ineffective in determining the reasonableness of the award where only nominal and punitive damages are awarded. *See, e.g., Local Union No. 38, Sheet Metal Workers' Intern. Ass'n, AFL–CIO v. Pelella,* 350 F.3d 73, 88 (2d Cir. 2003) ("[T]he ratios referred to in *[State Farm]* may not apply with equal force when punitive damages are compared to nominal damages."); *Williams v. Kaufman County,* 352 F.3d 994, 1016 (5th Cir. 2003) (finding, with respect to the second *Gore* guidepost, that "any punitive damages-to-*compensatory* damages 'ratio analysis' cannot be applied effectively in cases where only *nominal* damages have been awarded.") (emphasis in original); *Lee v. Edwards,* 101 F.3d 805, 811 (2d Cir.1996) (holding ratio between punitive and compensatory damages does not necessarily control where punitive and compensatory damages are awarded, but punitive damages are nominal in nature). While an argument could be forged that the *Gore* analysis does not apply where there are only awards of nominal and punitive damages; rather than foolishly disregard the holdings of the Supreme Court the more prudent path is to apply the *Gore* guideposts, but place less emphasis on the proportionality requirement than would be accorded in a situation where compensatory and punitive damages are at issue. With this in mind the court will now proceed to an analysis of the punitive damages award under the *Gore* guideposts.

### b. Analysis under the Gore guideposts

*Gore* instructs courts to review punitive damages awards under the following three guideposts: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the civil penalties authorized or imposed in comparable cases." *State Farm,* 538 U.S. at 418, 123 S.Ct. at 1520 (citing *Gore,* 517 U.S. at 575, 116 L.Ed.2d 14 (2001); *Bains L.L.C. v. Arco Prods. Co.,* 220 F.Supp.2d 1193, 1198 (W.D.Wash. 2002) (applying *Gore* guideposts to determine if punitive damages award for hostile work environment under § 1981 was constitutional). Likewise, the court will apply the *Gore* guideposts in determining whether the punitive damages award violated the defendant's due process rights under the Fifth Amendment.

*Stores, Inc.,* 247 F.3d 1091, 1116 (10th Cir. 2001) (applying *Gore* guideposts in determination of whether award of punitive damages in consumer § 1981 case violated due process), *cert. denied,* 534 U.S. 1131, 122 S.Ct. 1071, 151 L.Ed.2d 973 (2002); *Romano v. U–Haul Intern.,* 233 F.3d 655, 672–74 (1st Cir. 2000) (applying *Gore* guideposts to argument that punitive damages award for violation of Title VII violated the Fifth Amendment), *cert. denied,* 534 U.S. 815, 122 S.Ct. 41, 151

S.Ct. 1589). The court will now undertake this analysis of the case at bar.

■ *i. Reprehensibility.* "[T]he most important indicium of reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *Gore,* 517 U.S. at 575, 116 S.Ct. 1589. Reprehensibility of a defendant is determined by considering whether:

> the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery or deceit or mere accident.

*State Farm,* 538 U.S. at 419, 123 S.Ct. at 1521.

■ The defendant argues that its conduct does not fit any of the 'aggravating factors' the Supreme Court has instructed courts to consider in determining the reprehensibility of a defendant's conduct. Specifically, the defendant contends that: (1) there was no evidence of economic harm to the plaintiffs that was proximately caused by the defendant's conduct; (2) the defendant's conduct could not be classified as indifferent, or in reckless disregard, for the health or safety of others—the defendant conducted a satisfactory investigation following the alleged incident and did not discover the incident was racially related until the filing of the Civil Rights Complaint by the plaintiffs, by which time the offending employee was no longer employed by the defendant; (3) there was no evidence that the plaintiffs were financially vulnerable; (4) there was no evidence that the harm caused was the result of affirmative misconduct or purposeful false statements; and (5) the plaintiffs did not introduce any evidence of repeated misconduct by the defendant.

The plaintiffs assert that the defendant's conduct "was an assault against human dignity so reprehensible that federal statutes were enacted to expressly prohibit it." Plaintiffs' Resistance to Defendant's Partial Motion for Judgment as a Matter of Law or Motion for Partial New Trial or Remittitur of Punitive Damages Judgment, Doc. No. 31, at 6. Further, plaintiff contends that this type of conduct results in both individual harm, as well as societal harm.

A substantial gulf exists between the reprehensibility of the corporate defendants' actions in *Gore* and *State Farm,* and the reprehensibility of the defendant's conduct here. Both *Gore* and *State Farm* involved fraudulent business practices. *See State Farm,* 538 U.S. at 410–20, 123 S.Ct. at 1517–19 (policy to refuse to settle insurance claims to limit expenses and capping payments after losing at trial); *Gore,* 517 U.S. at 563–64, 116 S.Ct. 1589 (policy of failing to disclose practice of selling BMW's as new after repainting the cars to cover up pre-delivery damage). "[T]he reprehensibility of the fraudulent business practices at issue in these Supreme Court cases is different in kind from the reprehensibility of intentional discrimination on the basis of race or ethnicity." *Zhang v. Am. Gem. Seafoods, Inc.,* 339 F.3d 1020, 1043 (9th Cir.2003), *cert. denied,* —— U.S. ——, 124 S.Ct. 1602, 158 L.Ed.2d 244, 2004 WL 414031 (Mar. 8, 2004).

There can be no question of the importance of our society's interest in combating discrimination; this nation fought the bloodiest war in its history in part to advance the goal of racial equality, adding several amendments to the Constitution to cement the battlefield victory. *See* U.S. CONST. amends. XVII, XIV, XV. Freedom from discrimination on the basis of race or ethnicity is a fundamental human right recognized in international instruments to which the United

States is a party, *see, e.g.,* International Convention on the Elimination of All Forms of Racial Discrimination, adopted by the U.N. General Assembly Dec. 21, 1965, 660 U.N.T.S. 195 (entered into force for the United States Nov. 20, 1994), and the intentional deprivation of that freedom is highly reprehensible conduct.

*Id.* Further, the derogatory word at issue here—'nigger'—"ranks as perhaps the most offensive and inflammatory racial slur in English." MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 784 (10th ed.1995).

> President Kennedy, in submitting to Congress the public accommodations provisions of the proposed Civil Rights Act, emphasized that "no action is *more contrary to the spirit of our democracy and Constitution*—or more rightfully resented by a Negro citizen who seeks only equal treatment—than the barring of that citizen from restaurants, hotels, theatres, recreational areas and other public accommodations and facilities."

*Daniel v. Paul,* 395 U.S. 298, 89 S.Ct. 1697, 23 L.Ed.2d 318 (1969) (citing Special Message to the Congress on Civil Rights and Job Opportunities, June 19, 1963, in Public Papers of the Presidents, John F. Kennedy, 1963, at 485) (emphasis added). The incident in question in this case was but one step down from barring the plaintiffs from the restaurant entirely. Aside from the purely condemnable nature of the incident, the court finds a number of additional factors increase the reprehensibility level of the defendant's conduct. Namely: (1) The jury, in finding for each of the plaintiffs, expressly found that the defendant's employee *intentionally* discriminated against the plaintiffs based on their race; *Bogle v. McClure,* 332 F.3d 1347, 1361 (11th Cir.2003) (noting that courts have repeatedly "found intentional discrimination to be reprehensible under *Gore's* first guidepost" and likewise, finding intentional race discrimination in employment

discrimination case brought under § 1983 reprehensible); (2) in assessing punitive damages against the defendant the jury found that the defendant acted with reckless indifference to the plaintiffs' federally protected rights; and (3) the defendant did not offer any evidence that corrective action was taken to protect future would-be victims from this type of discrimination. *See TXO Production Corp. v. Alliance Resources Corp.,* 509 U.S. 443, 460, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993) (considering "possible harm to other victims" where no corrective action was taken, in assessing reasonableness of the punitive damages award); *Bains L.L.C. v. Arco Prods. Co.,* 220 F.Supp.2d 1193, 1200 (W.D.Wash.2002) (finding reprehensibility demonstrated by defendant's failure to investigate racial harassment complaint or improve the conditions at the facility). All of these factors serve to further increase the reprehensibility of the defendant's conduct. The rarity of § 1981 claims involving public accommodations and/or retail transactions further emphasizes the reprehensibility of the defendant's conduct. *See id.* at 1117 ("[F]ew § 1981 claims involve retail transactions, and fewer reach trial."). While this case is not one in which the 'highest' threshold of reprehensibility is present (i.e. acts and threats of violence), *Gore,* 517 U.S. at 575–76, 116 S.Ct. 1589, the degradation of an individual in this fashion based solely on their race in today's society certainly falls, in this court's view, in the upper echelon of reprehensible conduct. The court has no problem finding that the intentional denial of the services of a public accommodation based on the plaintiffs' race, in conjunction with the use of such a vile and hateful racial epithet, is sufficiently reprehensible to justify the punitive damages award of $12,500.00 per plaintiff.

*ii. Proportionality.* "The second and perhaps most commonly cited indicium of an unreasonable or excessive punitive

damages award is its ratio to the action harm inflicted on the plaintiff[s]." *Gore,* 517 U.S. at 580, 116 S.Ct. 1589. Predictably, with regard to this factor, the defendant draws heavily on the reality that the ratio per plaintiff, 12,500-to-1, is substantial and far in excess of the double-digit ratio contemplated by the Supreme Court in *State Farm.* The defendant also states that its conduct, even if viewed in the light most favorable to the plaintiff, is not particularly egregious. The defendant further elaborates on how its knowledge of the nature of the incident was hotly contested at trial, and how by the time the defendant was made aware of the nature of the offending employee's conduct, the employee had already ceased working for The Horizons Family Restaurant. The plaintiffs' argument focuses on the assertion that this is the type of injury in which the monetary value of the harm is difficult to ascertain—thereby justifying a higher ratio. The plaintiffs further argue that "[c]omparing the punitive award with the nominal damage award without considering the magnitude of future harm would result in a(sic) no punitive effect at all." Plaintiffs' Resistance to Defendant's Partial motion for Judgment as a Matter of Law or Motion for Partial New Trial or Remittitur of Punitive Damages Judgment, Doc. No. 31, at 7.

Despite requiring the disparity between the punitive and actual monetary awards to be reasonable, the Supreme Court has declined to impose a "bright-line ratio which a punitive damages award cannot exceed," and continues to rebuke the imposition of any rigid mathematical formula in determining the reasonableness of a punitive to compensatory damages ratio. *State Farm,* 538 U.S. at 425, 123 S.Ct. at 1524; *Gore,* 517 U.S. at 582, 116 S.Ct. 1589 ("[W]e have consistently rejected the notion that the constitutional line is marked by a simple mathematical formula"); *see United States v. Big D Enter., Inc.,* 184 F.3d 924 (8th Cir.1999) ("Consistent with the Supreme Court, we eschew facile reliance on mathematical formulas for determining the appropriateness of punitive damages awards."). In spite of its reluctance to draw a line in the sand that punitive damages awards may not cross, the Court has stated that "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *State Farm,* 538 U.S. at 425, 123 S.Ct. at 1524.

In regard to this guidepost, the Court has recognized that:

low awards of compensatory damages may properly support a higher ratio than high compensatory awards, if, for example, a particularly egregious act has resulted in only a small amount of economic damages. A higher ratio may also be justified in cases in which the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine.

*Gore,* 517 U.S. at 583, 116 S.Ct. 1589; *see also State Farm,* 538 U.S. at 425, 123 S.Ct. at 1524 ("Ratios greater than those we have previously upheld may comport with due process where 'a particularly egregious act has resulted in only a small amount of economic damages.' ") (citations omitted); *Cf. DiSorbo v. Hoy,* 343 F.3d 172, 187 (2d Cir.2003) (finding that where nominal compensatory damages were awarded, making the ratio 650,000-to-1, "the use of a multiplier to assess punitive damages is not the best tool") (citation and quotation omitted); *Lee,* 101 F.3d at 811 (holding that where compensatory damages are in actuality nominal "a much higher ratio can be contemplated while maintaining normal respiration.").

It is likely that many civil rights violations will fall into this category of cases in which it is difficult to assess a monetary

value to the harm suffered, thus resulting in only the imposition of nominal damages, but where punitive damages are warranted. "Because actions seeking vindication of constitutional rights are more likely to result only in nominal damages, strict proportionality would defeat the ability to award punitive damages at all." *Williams*, 352 F.3d at 1016. "A mathematical comparison of punitive damage awards to the nominal damage awards in civil rights cases where the plaintiff has not shown ... cognizable compensatory damages will inevitably produce ratios well in excess of 500 to 1, since a punitive award of $500 will [likely] constitute the minimum amount necessary to deter future unlawful conduct." *Tate v. Dragovich*, 2003 WL 21978141 at *9 (E.D.Pa. Aug.14, 2003). In fact the Eighth Circuit Court of Appeals, in a pre-*State Farm* and pre-*Gore* decision that is still good law today, held:

> To apply the proportionality rule to a nominal damages award would invalidate most punitive damages awards because only very low punitive damages award could be said to bear a reasonable relationship to the amount of a nominal damages award. Consequently, in those cases where the trial court has awarded nominal damages and punitive damages, we rely and give great deference to the trial court's discretion as to the amount of the punitive damages award it has permitted to stand.

*Edwards v. Jewish Hosp. of St. Louis*, 855 F.2d 1345, 1352 (8th Cir.1988).

This is one such civil rights case where the " 'injury is hard to detect [and] the monetary value of noneconomic harm ... is difficult to determine,' " thereby justifying a higher ratio. *Hampton*, 247 F.3d at 1117 (quoting *Bielicki v. Terminix Int'l Co.*, 225 F.3d 1159, 1166 (10th Cir.2000), in turn quoting *Gore*, 517 U.S. at 583, 116 S.Ct. 1589). Additionally, "[t]he jury's award of nominal damages and high punitive damages is reflective of its findings

that while compensatory damages were difficult to calculate, the egregiousness of Defendant's conduct was obvious to everyone in the courtroom." *Bains*, 220 F.Supp.2d at 1201. The disparity between the punitive and nominal damages is large, and may well approach the cusp of what is considered excessive. However, it is by no means the largest disparity to uphold constitutional scrutiny. *See id.* at 1200–03 (upholding, for violation of § 1981, a punitive damages award of $5,000,000.00 though only $1.00 in nominal damages was assessed). This case epitomizes the Supreme Court's rationale for refusing to erect a strict mathematical formula for the analysis of proportionality—to do so would leave unpunished the egregious conduct of defendants where the civil rights violation has resulted in injuries that are difficult to quantify. Despite the larger-than-average disparity, in light of the nature of the case as well as the egregiousness of the defendant's conduct, the court finds that an award of $12,500.00 per plaintiff is reasonable in this context.

***iii. Comparable civil or criminal penalties.*** The third indicium of excessiveness is exposed through a comparison between the punitive damages award and "the civil or criminal penalties that could be imposed for comparable misconduct." *Gore*, 517 U.S. at 583, 116 S.Ct. 1589. In *Gore* and *State Farm*, both of which involved a type of fraudulent business practice, the Supreme Court found that the maximum fine that could be imposed for the fraudulent conduct was $10,000.00, while the punitive damages awards in those cases were $2 million and $145 million, respectively. *State Farm*, 538 U.S. at 415–16, 123 S.Ct. at 1519; *Gore*, 517 U.S. at 583, 116 S.Ct. 1589. However, in this case, there are no comparable civil penalties—which is precisely the reason that the federal government implemented statutes that would protect an individual's civil

rights. For this very reason, some courts have found the third guidepost of limited utility in assessing the reasonableness of a punitive damages award for a civil rights violation. *See, e.g., Williams,* 352 F.3d at 1016 n. 77 (finding the third guidepost not easily applicable to a case involving a § 1983 violation). Notably, "Congress has not seen fit to impose any recovery caps in cases under § 1981[ ], although it has had ample opportunity to do so since the 1991 amendments." *Swinton v. Potomac Corp.,* 270 F.3d 794, 820 (9th Cir.2001); *see also Hampton v. Dillard Depart. Stores, Inc.,* 247 F.3d 1091, 1117 (10th Cir.2001) (noting, in analyzing the third *Gore* guidepost, that "Section 1981 does not have a statutory cap that limits punitive damages as does Title VII."); *Bains LLC,* 220 F.Supp.2d at 1202 (noting that "when Congress explicitly acted to set limits on awards under Title VII, it chose not to under the comparable § 1981 statute."). Though the Title VII punitive damages cap clearly does not apply to § 1981 cases, the Supreme Court has instructed courts to analyze this factor in light of such analogous restrictions in determining the constitutionality of a punitive damages award. *Gore,* 517 U.S. at 583–85, 116 S.Ct. 1589; *Swinton,* 270 F.3d at 820 (looking at the Title VII damages cap in analyzing the third guidepost in relation to a § 1981 case as the "Supreme Court has ... directed [courts] to refer to such analogous sanctions in determining the constitutionality of a punitive damages award."); *but see Bogle,* 332 F.3d at 1362 (refusing to apply the Title VII punitive damages cap by analogy to an employment discrimination case under § 1983). In this matter the $300,000.00 cap imposed on punitive damages under Title VII would not weigh in favor of a reduction in the punitive damages award as the cumulative punitive damages award is only $50,000.00. The large discrepancy that existed in *Gore* and *State Farm* is not present in this case.

Additionally, the defendant cannot claim that it was not on notice that it could be subject to punitive damages for violation of § 1981, as the availability of punitive damages under this section is well established. *See Johnson v. Railway Express Agency, Inc.,* 421 U.S. 454, 459–60, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975) ("An individual who establishes a cause of action under § 1981 is entitled to both equitable and legal relief, including compensatory and, under certain circumstances, punitive damages."). The defendant "had ample notice it was subject to punitive damages for conduct that was ... in gross disregard of plaintiffs['] rights." *Hampton,* 247 F.3d at 1116.

*iv. Resolution.* In light of the foregoing analysis of the punitive damages award under the *Gore* guideposts—on balance, the court has concluded that the punitive damages award of $12,500.00 per plaintiff is reasonable and does not violate the defendant's due process rights. Further, as the award is not unconstitutionally excessive, the court will not reduce the punitive damages award on this ground.

### C. Plaintiffs' Motion to Make Additional Findings

The court now turns to the plaintiffs' Motion to Make Additional Findings filed March 1, 2004. (Doc. No. 27). In light of the verdict for the plaintiffs, and the fact that 42 U.S.C. § 2000a is enforceable only by injunctive relief, the plaintiffs' motion requests that the court: (1) amend the judgment to enjoin the defendant from racially discriminating in providing services in the future; (2) require the defendant to treat all patrons equally regardless of their race; (3) order the defendant to train all of its employees to seat and serve all patrons equally regardless of their race; and (4) require the defendant to provide proof that all employees have completed such training. The defendant re-

sists the plaintiffs' motion, and argues that the evidence does not support a pattern of racial discrimination, the alleged incident occurred almost three years ago, the defendant's response to the situation was reasonable, and a court order requiring additional training would place a significant burden on the defendant as well as cause it public embarrassment.

■■■ The plaintiff asserts that the court has authority under Federal Rule of Civil Procedure 52(b) to make additional findings and amend the judgment as requested by the plaintiffs. Federal Rule of Civil Procedure 52(b) provides in relevant part:

> **(b) Amendment.** On a party's motion filed no later than 10 days after entry of judgment, the court may amend its findings—or make additional findings—and may amend the judgment accordingly....

FED. R. CIV. P. 52(b) (2004). Rule 52(b) is "intended to permit a party to move the trial court to clarify or supplement fact-findings to enable the appellate court to understand the factual issues determined at trial." *Clark v. Nix,* 578 F.Supp. 1515, 1516 (D.Iowa 1984). "Motions made under [Rule 52(b)] ... are not intended merely to relitigate old matters nor are such motions intended to allow the parties to present the case under new theories of law." *Evans, Inc. v. Tiffany & Co.,* 416 F.Supp. 224, 244 (D.C.Ill.1976). The purpose of Rule 52(b) is to provide the court an opportunity to correct manifest errors of law or fact at trial. *Clark v. Nix,* 578 F.Supp. 1515, 1516 (D.Iowa 1984); *see Luxton v. State Farm Life Ins. Co.,* 2002 WL 254023, (D.Minn. Jan.15, 2002); *Baufield v. Safelite Glass Corp.,* 831 F.Supp. 713, 716 n. 4 (D.Minn.1993); *Piekarski v. Home Owners Sav. Bank, F.S.B.,* 759 F.Supp. 542, 545 (D.Minn.1991).

■■■ However, the crux of the plaintiffs' motion appears to revolve around the correctness, or completeness, of the judgment entered rather than a plea to the court to make additional findings. This leads the court to believe that the plaintiffs' motion is, in fact, an improperly styled Rule 59(e) motion. *See Norman v. Arkansas Dept. of Educ.,* 79 F.3d 748, 750 (8th Cir.1996) (" 'any motion that draws into question the correctness of the judgment is functionally a motion under [Rule 59(e) ], whatever its label.' ") (quoting *Quartana v. Utterback,* 789 F.2d 1297, 1300 (8th Cir.1986)). The substance of the motion, not its nomenclature, is controlling. *BBCA, Inc. v. U.S.,* 954 F.2d 1429, 1431–32 (8th Cir.1992), *cert. denied,* 506 U.S. 866, 113 S.Ct. 192 121 L.Ed.2d 136 (1992). Rule 59(e) provides that "any motion to alter or amend a judgment shall be filed no later than 10 days after entry of the judgment." FED. R. CIV. P. 59(e). The purpose behind the enactment of Rule 59(e) was " 'to mak[e] clear that the district court possesse[d] the power to rectify its own mistakes in the period immediately following the entry of judgment.' " *Norman,* 79 F.3d at 750 (quoting *White v. New Hampshire Dept. of Employment Sec.,* 455 U.S. 445, 450, 102 S.Ct. 1162, 1166, 71 L.Ed.2d 325 (1982)). Like Rule 52(b) motions, Rule 59(e) motions "serve the limited function of correcting manifest errors of law or fact or to present newly discovered evidence." *Innovative Home Health Care, Inc. v. P.T.-O.T. Assocs. of the Black Hills,* 141 F.3d 1284, 1286 (8th Cir.1998); *see Hagerman v. Yukon Energy Corp.,* 839 F.2d 407, 413 (8th Cir.), *cert. denied,* 488 U.S. 820, 109 S.Ct. 63, 102 L.Ed.2d 40 (1988). "A district court has broad discretion in determining whether to grant a motion to alter or amend judgment, [and will not be reversed] absent a clear abuse of discretion." *Global Network Technologies, Inc. v. Regional Airport Auth. of Louisville and Jefferson County,* 122 F.3d 661, 665 (8th Cir.1997). The plaintiffs' mo-

tion, filed on March 1, 2004, is timely under Rule 59(e).

> § 2000a ... empowers the Court to enjoin future discrimination or segregation in places of public accommodation. *Adickes v. S. H. Kress & Co.,* 398 U.S. 144, 150–51, 90 S.Ct. 1598, 1604–05, 26 L.Ed.2d 142 (1970). As the Supreme Court noted, "[if a plaintiff] obtains an injunction, he does so not for himself alone but also as a 'private attorney general'." *Newman v. Piggie Park Enterprises,* 390 U.S. 400, 402, 88 S.Ct. 964, 966, 19 L.Ed.2d 1263 (1968); *see* 42 U.S.C. § 2000a–3. To succeed, plaintiffs must present sufficient evidence to constitute a prima facie case of racial discrimination. *Dean v. Ashling,* 409 F.2d 754, 756 (5th Cir.1969).

*Jackson v. Tyler's Dad's Place, Inc.,* 850 F.Supp. 53, 56 (D.D.C.1994). It is undisputed that violation of 42 U.S.C § 2000a is enforceable only through injunctive relief. 42 U.S.C. § 2000a–3(a) ("a civil action for preventive relief, including an application for a permanent or temporary injunction, restraining order, or other order, may be instituted by the person aggrieved ...."); 42 U.S.C. § 2000a–6 (b) ("The remedies provided in this subchapter shall be the exclusive means of enforcing the rights based on this subchapter...."); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 150 n. 5, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *U.S. v. Johnson,* 390 U.S. 563, 564, 88 S.Ct. 1231, 20 L.Ed.2d 132 (1968) (noting that § 2000a is enforceable exclusively via injunctive relief); *Newman v. Piggie Park Enter., Inc.,* 390 U.S. 400, 88 S.Ct. 964, 19 L.Ed.2d 1263 (1968) (recognizing that only injunctive relief is available under § 2000a); *Wilson v. Waffle House,* 1998 WL 1665880, at *1 (M.D.Ala. Apr.28, 1998) ("Remedies avail-able under § 2000a are limited to injunctive relief, costs and attorney fees.")[19] Notably, prevailing plaintiffs are also entitled to equitable relief for violations of § 1981. *See Johnson,* 421 U.S. at 460, 95 S.Ct. 1716 ("An individual who establishes a cause of action under § 1981 is entitled to *both equitable and legal relief,* including compensatory and, under certain circumstances, punitive damages.") (emphasis added).

■ "District court's have broad discretion to issue an injunction once discrimination has been established ...." *Briscoe v. Fred's Dollar Store,* 24 F.3d 1026, 1028 (8th Cir.1994); *see E.E.O.C. v. HBE Corp.,* 135 F.3d 543, 557 (8th Cir.1998) (citing *Briscoe* for the principle that "[a] court may exercise its discretion to fashion injunctive relief to remedy the effects of racial discrimination."). The district court's discretion is limited, however, in that the scope of the injunction may not be broader than necessary to remedy the underlying wrong. *Easley v. Anheuser-Busch, Inc.,* 758 F.2d 251, 263 (8th Cir. 1985). The district court's use of this discretion in issuing injunctive relief is reviewed for abuse of discretion. *Briscoe,* 24 F.3d at 1028.

■ In order to establish a violation of 42 U.S.C. § 2000a the plaintiffs had to show that, because of their race, they were denied "full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation." 42 U.S.C. § 2000a(a). After considering all of the evidence, the jury found for each of the plaintiffs—thus solidifying the plaintiffs' allegations of racial discrimination· in a public accommodation into a legal reality.

---

19. Equitable relief is also available under the plaintiffs' § 1981 claim. *Johnson v. Railway Express Agency, Inc.,* 421 U.S. 454, 460, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975) ("An indi-vidual who establishes a cause of action under § 1981 is entitled to both equitable and legal relief.").

There was no argument that the defendant was not a 'public accommodation' as defined by statute—nor could such an argument have been feasibly raised. *See* 42 U.S.C. § 2000a(b)(2) (defining a restaurant engaged in selling food on the premises, that serves the public, and whose operations affect commerce, as falling within the definition of a 'public accommodation'). Section 2000a would amount to nothing more than an antiquated relic were the court, in a situation where the jury has found that the plaintiffs have been denied the full enjoyment of the services of a restaurant on account of their race, to do nothing merely because the defendant continues to assert that it did nothing wrong.[20] The defendant's resistance does not contain even a single citation to any legal authority, let alone to legal authority that would support its position. Rather, the defendant insists that its response to the incident was reasonable, that the evidence established that its employees are properly trained, that any order of this court would be both burdensome and cause the defendant to suffer embarrassment within the community. The court is not persuaded by the defendant's pleas. The jury unconditionally found the defendant's response to the incident unreasonable, the training methods inadequate, and the defendant's position untenable in finding that intentional racial discrimination against each and every plaintiff occurred on June 23, 2001. Further, the jury found the defendant callously and recklessly indifferent to the plaintiffs' civil rights in awarding punitive damages. The training methods the defendant asserts are adequate consist of an inconspicuous statement in the employee pamphlet requiring professional behavior—this is obviously not enough. Given the defendant's unyielding position that its actions were reasonable and that the employee pamphlet is adequate, together with the evidence suggesting the waiter had acted in this manner before and the fact that the night manager on duty affirmed this conduct, the court finds that the future violations of the law can be effectively deterred only through the issuance of an injunction. *Compare Anderson v. Pass Christian Isles Golf Club, Inc.,* 488 F.2d 855, 858 (5th Cir.1974) (granting permanent injunctive relief, in action under § 2000a, where black plaintiffs were denied access to defendant golf course based on defendant's policy of excluding blacks) *and Black v. Bonds,* 308 F.Supp. 774 (S.D.Ala.1969) (granting permanent injunction pursuant to § 2000a where court found waitress at defendant's restaurant refused to serve plaintiffs because they were black) *with Thomas v. Orangeburg Theaters, Inc.,* 241 F.Supp. 317, (E.D.S.C.1965) (finding injunctive relief unnecessary to prevent future civil rights violations where defendant theater had been operating on a non-segregated basis since one month after the alleged incident). In the spirit, and with the authorization, of § 2000a, the court finds that equitable relief in the form of an injunction, posting of notice, and training is warranted in order to prevent future harm. *See E.E.O.C. v. Red River Beverage Co.,* 2003 WL 21317861 at *1–2 (N.D.Tex. Mar.7, 2003) (ordering a three-year injunction and employee training in Title VII retaliatory discharge case in

---

**20.** In its resistance to the plaintiffs' motion, the defendant asserts that injunctive relief is not appropriate as there was no evidence of a pattern or practice of racial discrimination. A pattern of racial discrimination is *not required* for a private party to bring suit, or for liability to be found, under § 2000a—a pat-

tern or practice of discrimination is only necessary where the Attorney General seeks to institute a civil action for injunctive relief under § 2000a. 42 U.S.C. § 2000a–5(a); *see Newman,* 390 U.S. at 402 n. 2, 88 S.Ct. 964 (discussing when intervention by the Attorney General is permitted by 2000a).

which there was no evidence of a pattern or practice of said conduct by the defendant where the defendant could not put forth clear and convincing proof that there would be no further violation of the law); *Spina v. Forest Preserve Dist. of Cook County*, 2002 WL 1769994 at *3–5 (N.D.Ill. July 31, 2002) (ordering equitable relief in the form of a permanent injunction, development of a sexual harassment and retaliation policy, mandated comprehensive training, and implementation of a complaint and investigation procedure where evidence established a pattern and practice of sexual harassment and retaliation, where the policies the defendant had in place were improperly implemented and ineffective, and where a strong possibility existed that the discrimination would persist); *Wells v. Lobb & Co., Inc.*, 1999 WL 1268331 at *1–5 (D.Colo. Dec.1, 1999) (ordering extensive and complex injunctive relief in the form of a permanent injunction, record keeping and reporting requirements, posting of notice, development of a sexual harassment policy, mandatory training, and the issuance of an apology in Title VII sexual harassment case where a pattern and practice of sexual harassment existed and the defendants were found to have acted intentionally and with malice and reckless indifference to the plaintiffs' federal rights); *but see Kulling v. Grinders For Industry, Inc.*, 185 F.Supp.2d 800, 822–823 (E.D.Mich.2002) (denying injunctive relief proposed by the plaintiff, which included a permanent injunction, appointment of a 'special monitor' and annual training, where there was no evidence of a pattern and practice of age discrimination, where, even if issued, the injunctive relief would not benefit the plaintiffs, and where the court found that the aggregate monetary award of over $600,000.00 in addition to attorney fees and costs was sufficient to discourage the defendants from further violation of federal age discrimination laws); *Ward v. Tipton County Sheriff Depart.*, 937 F.Supp. 791, 800 (S.D.Ind.1996) (finding injunctive relief requested by the plaintiff—court ordered seminars and training for defendant's staff on equal employment—unnecessary considering the monetary damage awards, $80,000.00 in damages plus $60,000.00 in attorneys fees, in combination with the attention and publicity generated by the case). As more fully described below, the equitable relief in this case will consist of a two-year injunction, posting of notice, and dissemination of an anti-discrimination in a public accommodation policy. However, the court will not order mandatory training as the damages award in conjunction with the award of attorney's fees and other equitable relief will provide sufficient deterrence, *see Ward*, 937 F.Supp. at 800, and because ordering training would place an enormous burden on a small, family-owned business such as the defendant. Therefore, the plaintiffs' motion to make additional findings is **granted**.

### D. Plaintiffs' Application For Attorney's Fees

In their application, the plaintiffs seek an award of attorney's fees in the amount of $20,170.00 pursuant to 42 U.S.C. § 1988 as well as $281.46 for expenses incurred during the course of litigation. These figures are current through March 12, 2004, and represent a combined total for the work of attorneys Shelley A. Horak, Robert Tiefenthaler, and Jacquelyn Johnson. The defendant argues that the plaintiffs' fee application should be reduced because: (1) the hourly rates of the plaintiffs' attorneys are excessive and are not supported by the required affidavits; (2) the number of hours claimed by the plaintiffs are excessive; and (3) assuming the defendant's post-trial motion is successful, the fee should be reduced due to limited success.

### 1. Applicable Standards

Title 42 U.S.C. § 1988(b) provides: "In any action or proceeding to enforce a provision of sections 1981, 1981a, 1982, 1983, 1985, and 1986 of this title ... the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs...." 42 U.S.C. § 1988(b).

■ The court has discussed the standards by which fees are awarded in its prior decisions, including, for example, *Baker v. John Morrell & Co.*, 263 F.Supp.2d 1161, 1188 (N.D.Iowa 2003); *Rural Water Sys. No. 1 v. City of Sioux Ctr., Iowa*, 38 F.Supp.2d 1057, 1062–63 (N.D.Iowa 1999), *aff'd*, 202 F.3d 1035 (8th Cir.2000), *Schultz v. Amick*, 955 F.Supp. 1087 (N.D.Iowa 1997), and *Houghton v. Sipco, Inc.*, 828 F.Supp. 631 (S.D.Iowa 1993), *vacated on other grounds*, 38 F.3d 953 (8th Cir.1994). Thus, the court will not engage in another detailed recitation of applicable standards. Instead, it suffices to say that "a prevailing plaintiff " 'should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust.'" *See Hensley v. Eckerhart*, 461 U.S. 424, 429, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983) (interpreting Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988, which allows a "prevailing party" to recover from his or her adversary "a reasonable attorney's fee as part of the costs") (internal quotation marks omitted) (quoting S.Rep. No. 94–1011, p. 4 (1976), U.S.Code Cong. & Admin.News 1976, pp. 5908, 5911–12, in turn quoting *Newman v. Piggie Park Enter., Inc.*, 390 U.S. 400, 402, 88 S.Ct. 964, 19 L.Ed.2d 1263 (1968)); *accord Schultz*, 955 F.Supp. at 1109.

■ Fees are usually calculated according to the "lodestar" method, which multiplies hours reasonably expended by a reasonable hourly rate. *Schultz*, 955 F.Supp. at 1110; *accord Warren v. Prejean*, 301 F.3d 893, 904 (8th Cir.2002) (" 'The starting point in determining attorney fees is the lodestar, which is calculated by multiplying the number of hours expended by the reasonable hourly rates.' ") (quoting *Fish v. St. Cloud State Univ.*, 295 F.3d 849, 851 (8th Cir.2002)). Still, under *Hensley*, "the most critical factor is the degree of success obtained." *Hensley*, 461 U.S. at 436, 103 S.Ct. 1933; *see also Emery v. Hunt*, 272 F.3d 1042, 1047 (8th Cir.2001) (characterizing *Hensley* standard as "result-oriented") (quoting *Hensley*, 461 U.S. at 436, 103 S.Ct. 1933; citing *Jenkins v. Missouri*, 127 F.3d 709, 718 (8th Cir. 1997) (en banc)). The process of arriving at reasonableness includes "the plaintiff's overall success; the necessity and usefulness of the plaintiff's activity in the particular matter for which fees are requested; and the efficiency with which the plaintiff's attorneys conducted that activity." *Jenkins*, 127 F.3d at 718. Reductions may be made, however, for such things as partial success, duplicative hours or hours not reasonably expended, *Schultz*, 955 F.Supp. at 1111–12, 1114–16, or for "block billing" or poor record-keeping. *See Houghton*, 828 F.Supp. at 643–44.

### 2. Reasonable hourly rate

■ "As a general rule, a reasonable hourly rate is the prevailing market rate, that is, 'the ordinary rate for similar work in the community where the case has been litigated.' " *Moysis v. DTG Datanet*, 278 F.3d 819, 828–29 (8th Cir.2002) (quoting *Emery v. Hunt*, 272 F.3d 1042, 1047 (8th Cir.2001)). It is well established that the party seeking attorney's fees has the burden to prove that its request for attorney's fees is reasonable. *Johnston v. Comerica Mortg. Corp.*, 83 F.3d 241, 246 (8th Cir.1996) (citing *Hensley*, 461 U.S. at 433, 103 S.Ct. 1933). In a statutory fee case, such as this one, the party opposing the fee award then has the burden to

challenge, by affidavit or brief with sufficient specificity to give fee applicants notice, the reasonableness of the requested fee. *Bell v. United Princeton Props., Inc.,* 884 F.2d 713 (3d Cir.1989). In determining a reasonable attorney fee, the district court should consider the factors set forth in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 717–19 (5th Cir.1974), though the court need not exhaustively address every factor.[21] *Emery v. Hunt,* 272 F.3d 1042, 1048 (8th Cir.2001). Nevertheless, the district court should consider what factors, "in the context of the present case, deserve explicit consideration." *Griffin v. Jim Jamison, Inc.,* 188 F.3d 996, 997–98 (8th Cir.1999).

In addition, the district court may consider other factors, such as the attorney's regular hourly rates, skill of representation, difficulty of work performed, and counsel's experience and reputation. *See Blum v. Stenson,* 465 U.S. 886, 895 n. 11, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984). A court should also use its own knowledge, experience and expertise in determining the fee to be awarded. *Gilbert v. City of Little Rock, Ark.,* 867 F.2d 1063, 1066–67 (8th Cir.1989).

In this matter the plaintiffs' attorneys, Ms. Horak and Mr. Tiefenthaler, request an hourly rate of $200. Ms. Horak and Mr. Tiefenthaler assert that this rate is reasonable in light of their experience with civil rights cases and their years of practice. The defendant believes that neither Ms. Horak nor Mr. Tiefenthaler[22] are entitled to charge a fee in excess of $175/hour. The defendant supports his argument by pointing out the following: (1) in the case of *Murray v. City of Onawa,* No. CV00–4103–DEO, a case arising under § 1983 that was tried on September 18, 2000, Ms. Horak requested a fee of only $140 per hour; (2) plaintiffs' counsels' experience is far more equivalent to that of defendant's counsel, Mr. Jay Denne, whom recently was awarded a fee of $175 per hour in *Baker v. John Morrell,* 263 F.Supp.2d 1161, 1195 (N.D.Iowa 2003); (3) plaintiffs have not submitted any affidavits or other evidence warranting a rate of $200 per hour.

As the defendant points out, the plaintiffs have not submitted *any* affidavits supporting their position that $200 per hour is a reasonable rate. The only materials submitted to the court were the plaintiffs' application for attorneys fees, and the billing sheets of both attorneys to their respective clients.[23] The billing sheets state that the rate for both Ms. Horak and Mr. Tiefenthaler is $200 per hour—however, these "bills" were likely prepared solely for the purposes of this motion, as the plaintiffs' attorneys undertook this litigation on a contingency basis. As the court stated above, the party seeking attorney's

---

**21.** The *Johnson* factors are: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Johnson,* 488 F.2d at 717–19.

**22.** Though the defendant's resistance to the fee application facially attacks the $200/hour award only as to Ms. Horak, the court assumes that the failure to include Mr. Tiefenthaler in this argument was a mere oversight, and will consider the defendant's attack on a $200/hour award as to both Ms. Horak and Mr. Tiefenthaler.

**23.** In this matter the plaintiffs submitted a single, consolidated, application for attorney's fees for both Ms. Horak and Mr. Tiefenthaler.

fees has the burden to prove that its request for attorney's fees is reasonable. *Johnston,* 83 F.3d at 246 (citing *Hensley,* 461 U.S. at 433, 103 S.Ct. 1933). At oral argument, Ms. Horak made the professional statement, on the record, that she has charged her private clients an hourly rate of $200 for her services. Ms. Horak has been licensed to practice law in Iowa since 1990, Ms. Horak has also tried several civil rights cases to completion as well as negotiated settlements in civil rights cases. Ms. Horak is entitled to a rate of $200 per hour. Mr. Tiefenthaler has been admitted to practice in Iowa since 1994, and has tried one civil rights case prior to this matter and has negotiated settlements in other civil rights cases. The defendant is correct that comparably, the experience of Mr. Tiefenthaler is close to that of defendant's counsel, Mr. Denne—who has acted as an associate attorney in employment discrimination cases since 1995, and lead attorney in employment discrimination cases since 1998. The defendant correctly asserts that Mr. Denne was awarded $175 per hour for his work in an employment discrimination case in front of this court last year. *See Baker,* 263 F.Supp.2d at 1195. However, to account for inflation, and for the fact that Mr. Tiefenthaler has one more year of experience than Mr. Denne, the court finds that a reasonable rate for Mr. Tiefenthaler's services is $185 per hour. Therefore, the court finds that an hourly rate of $200 for Ms. Horak and $185 for Mr. Tiefenthaler is "consistent with market rates and practices" for similar work in the community. *See Jenkins,* 491 U.S. at 287, 109 S.Ct. 2463; *Moysis v. DTG Datanet,* 278 F.3d 819, 828–29 (8th Cir.2002). The defendant did not challenge the hourly rate of $100 claimed for associate attorney Ms. Johnson—the court

finds this hourly rate reasonable. Accordingly, the court will utilize these hourly rates in arriving at the lodestar amount in this case.

### 3. Hours reasonably expended

The defendant next challenges the number of hours that the plaintiffs claim were expended. Ms. Horak and Mr. Tiefenthaler assert that a total of 104.6 [24] hours were expended. The defendant takes issue with this figure for a number of reasons: (1) the billing statement attached to the plaintiffs' fee application is not itemized as required by Local Rule 54.2(a), and therefore provides limited information; (2) this case did not involve extensive discovery or pretrial summary judgment motions; (3) the trial lasted only one and one-half days; and (4) defendant's counsel through the completion of the trial, Mr. Vakulskas, expended only 41.75 hours on this matter—less than half of the time claimed by the plaintiffs' two attorneys. The defendant asserts that the plaintiffs' attorneys' application does not illustrate why the additional hours (above those expended by Mr. Vakulskas) were necessary—therefore the number of hours should be reduced. Further, the defendant argues that an additional reduction is warranted for excessive and/or duplicative hours claimed.

This court has repeatedly held that attorney fees may be reduced for inadequate documentation or poor record-keeping. *See, e.g., Rural Water Sys. # 1,* 38 F.Supp.2d at 1063 (citing *Houghton,* 828 F.Supp. at 643–44, *vacated on other grounds,* 38 F.3d 953 (8th Cir.1994)). In the face of arguments that the fees claimed are vaguely described, duplicative, or excessive for the work done, the court should carefully review the documentation

---

**24.** The plaintiffs' application states that they are claiming 104.45 hours, but adding up the hours on the billing statements attached as an exhibit to the plaintiffs' application yields a total of 104.6 hours.

supporting the fee request and provide reasons for determination of the amount awarded. *See Mansker v. TMG Life Ins. Co.*, 54 F.3d 1322, 1330 (8th Cir.1995). With regard to fee applications, Local Rule 54.2(a) provides, in relevant part:

> The claimed amount must be supported by an itemization that includes a detailed listing of the time claimed for each specific task and the hourly rate claimed. The itemization also must include a separate summary indicating the total time spent performing each of the following major categories of work:
>
> 1. Drafting pleadings, motions, and briefs;
> 2. Legal research;
> 3. Investigation;
> 4. Interviewing;
> 5. Trial preparation; and
> 6. Trial.

L.R. 54.2(a).

Only a brief review of the plaintiffs' fee application is necessary for one to realize that the plaintiffs' submission wholly fails to comply with Local Rule 54.2(a). However, the attached billing statements do provide detailed descriptions of the activity undertaken for each increment of time claimed, as well as which billing increments are attributable to either Ms. Horak or Mr. Tiefenthaler. The billing statements are complete enough for the court to ascertain that the time billed for the activities listed is reasonable. Therefore, the court will not reduce the reasonable hourly rate on the basis of poor-record keeping. Further, the court is convinced that the submissions adequately demonstrate why Ms. Horak and Mr. Tiefenthaler would have collectively expended more

hours on this matter than Mr. Vakulskas. This is not the traditional situation where there are two attorneys representing the plaintiffs—one lead counsel, and the other non-lead counsel. In this matter, Ms. Horak functioned as counsel for three of the plaintiffs, while Mr. Tiefenthaler represented the fourth plaintiff. Though each attorney took the steps necessary to represent their individual clients, it was imperative, in order to present a unified front at trial, for communication to take place between Ms. Horak and Mr. Tiefenthaler. In fact, when each individual attorneys' hours are compared it is obvious that Ms. Horak and Mr. Tiefenthaler did not spend much more time than Mr. Vakulskas on the matter: Ms. Horak = 54; Mr. Tiefenthaler = 43.1; Mr. Vakulskas = 41.75. Due to the fact that dual representation was necessary, most likely due to the fact that two of the plaintiffs were brothers, it is not unreasonable to the court that Ms. Horak's and Mr. Tiefenthaler's combined hours were approximately double those spent by defense counsel. However, after reviewing the submissions the court finds that some reduction in hours is necessary—particularly for those time increments which are described as conferences with counsel that are not reflected on that counsel's bill—for example, the court is speaking of the situation in which Ms. Horak's billing statement assigns an increment of time for a telephone conference with Mr. Tiefenthaler and Mr. Tiefenthaler's billing statement does not corroborate that conference, or vice versa. The 'uncorroborated' conferences amount to a total reduction of 0.1 hours [25] for Ms. Horak and 0.5 hours [26] for Mr. Tiefenthaler. This

---

**25.** The uncorroborated time entry is: 8/17/2002 "Correspondence to Bob T re scheduling" = 0.1 hours.

**26.** There are two uncorroborated time entries on Mr. Tiefenthaler's billing statement: (1)

11/4/2003 "Telephone conference with Horak" = 0.4 hours; and (2) the entry for 02/16/04 is reduced by 0.1 hours to account for the uncorroborated "telephone conference with Horak."

brings the total reasonable hours expended to: Ms. Horak = 53.9 hours; Ms. Johnson = 7.5 hours[27]; and Mr. Tiefenthaler = 42.6 hours. Applying the reasonable rate determined above, the lodestar figure comes to $19,411.00.[28] The plaintiffs' application for attorney's fees is **granted**. The court awards the plaintiffs **$19,411.00** in attorney's fees.

### 4. Recoverable costs and expenses

Federal Rule of Civil Procedure 54(d)(1) provides for the award of costs, other than attorney's fees, to the prevailing party. Rule 54(d) works in tandem with 28 U.S.C. § 1920. The taxable costs which may be recovered as specified in 28 U.S.C. § 1920 include: (1) fees of the clerk; (2) fees for transcripts; (3) fees for printing and witnesses; (4) fees for copies of papers "necessarily" used in the case; (5) docketing fees; and (6) compensation of court-appointed experts and interpreters. 28 U.S.C. § 1920. However, 28 U.S.C. § 1920 is not the court's sole source of authority in determining which costs and expenses are recoverable by a prevailing party. Some "costs" that are not available under 28 U.S.C. § 1920 are recoverable as "reasonable out-of-pocket expenses of the kind normally charged to clients by attorneys, and thus should [be] included as part of the reasonable attorney's fees awarded" under 42 U.S.C. § 1988. *See, e.g., Pinkham v. Camex, Inc.,* 84 F.3d 292, 294–95 (8th Cir.1996) (per curiam) (citations omitted).

As part of their fee request, the plaintiffs seek an award of costs and expenses in this case in the amount of $281.46. The costs claimed consist of photocopies, postage, faxes, and the service of a subpoena. The defendant does not object to the expenses claimed by the plaintiffs. From examination of the documentation provided, the court finds that all of the expenditures reported by the plaintiffs are recoverable as costs under 28 U.S.C. § 1920 and as allowable expenses under 42 U.S.C. § 1988(b).

### III. CONCLUSION

The court has considered each of the grounds raised in the defendant's Partial Motion for Judgment as a Matter of Law or in the Alternative, Motion for Partial New Trial or Remittitur of Punitive Damages Verdict and Judgment, and concludes that the motion must be **denied**.

Additionally, the plaintiffs' Motion to Make Additional Findings is **granted**. The court finds that injunctive relief should be ordered against the defendant for **two years** from the date of this order to restrain future violations of the anti-discrimination in a public accommodation provisions of 42 U.S.C. § 1981, 42 U.S.C. § 2000a and IOWA CODE § 216.7 based on the evidence adduced at trial.

**IT IS HEREBY ORDERED AND ADJUDGED** that the defendant, Mr. Nick Kasotakis d/b/a The Horizons Family Restaurant, its agents, managers, employees, attorneys, successors and assigns are here-

---

27. The defendant does not contest the number of hours claimed by Ms. Johnson. The court has reviewed the billing statement submitted by the plaintiffs and finds the number of hours claimed by Ms. Johnson to be reasonable and in proportion to the described activity.

28.
- Jacquelyn Johnson = $100/hour × 7.5 hours = $750.00
- Shelley Horak = $200/hour × 53.9 hours = $10,780.00
- Robert Tiefenthaler = $185/hour × 42.6 hours = $7,881.00
    **TOTAL** = $19,411.00

by enjoined and restrained from causing, encouraging, condoning or permitting discrimination against any consumer seeking the full and complete enjoyment of the defendant's services and accommodations based on that consumer's race in violation of 42 U.S.C. § 1981, 42 U.S.C. § 2000a and IOWA CODE § 216.7 for a period of two years. Further, the defendant, within 30 days after the entry of this order, shall develop an anti-discrimination in a public accommodation policy and distribute said policy to all current employees. The policy shall inform the employees of the types of conduct that constitute violations of a customer's civil rights and establish a zero-tolerance policy for violators. New employees shall be provided with a copy of the policy at the time of their hire. All employees shall be required to sign an acknowledgment of receipt of the policy. The defendant must retain these acknowledgments throughout the term of the injunction. A copy of the policy shall be filed with the Clerk of the Court, serviced on counsel for the plaintiffs, and posted conspicuously at defendant's premises within 30 days from the date of this order. To meet the posting requirement, the defendant must post the notice in a location in which it is readily visible to the employees—the defendant is *not* required to post the notice such that it can be readily viewed by the general public. Further, every six months from the date of this order until the culmination of the injunction, the defendant shall file with this court, and mail to plaintiffs' counsel, an affidavit in which the defendant attests to the fact that it is in compliance with the terms of this injunction. Absent a stay, failure to comply with the terms of this injunction will result in civil contempt proceedings.

The court also **grants** the plaintiffs' Application for Attorney's Fees and Costs, having concluded that the plaintiffs' are entitled to attorney's fees in the amount of $19,411.00 and expenses in the amount of $281.46. Thus, adding these amounts together, the total of the plaintiffs' **attorney's fees and costs award is $19,692.46**. This attorney's fee represents counsels' time and expenses through the date the fee application was filed, March 12, 2004. The court recognizes that additional service may have been provided by counsel to orally argue and defend against the defendant's motion for partial judgment as a matter of law and/or new trial and/or remittitur, as well as to argue for the grant of their own motions. Therefore, **the plaintiffs shall have to and including May 3, 2004, in which to file a supplemental fee application** for fees and expenses incurred subsequent to the date of the fee application. The **defendant shall then have to and including May 10, 2004, in which to file a response** to the plaintiffs' supplemental fee position.

**IT IS SO ORDERED.**